ORIGINAL

FILED
SEP - 3 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE DIRECTV GROUP, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No: 04-1414C |

**COMPLAINT**

For its Complaint in this action, Plaintiff, The DIRECTV Group, Inc. ("DIRECTV," as further defined below) alleges as follows:

1. This suit arises from a dispute between DIRECTV and the United States of America relating to DIRECTV's compliance with Cost Accounting Standard ("CAS") 413 in connection with (a) DIRECTV's transfer of all pension fund assets and liabilities pertaining to its defense business units ("Defense Segment") to the Raytheon Company ("Raytheon") as part of a transfer of the Defense Segment to Raytheon effective December 17, 1997 ("Raytheon transaction," as further described below) and (b) DIRECTV's transfer of all pension fund assets and liabilities pertaining to its satellite business units ("Satellite Segment") to the Boeing Company ("Boeing") as part of a sale of the Satellite Segment to Boeing effective October 6, 2000 ("Boeing transaction"). DIRECTV brings this action to contest (i) the final decision of a Contracting Officer and Defense Corporate Executive ("Contracting Officer") dated September 30, 2003, asserting against DIRECTV a Government claim of non-compliance with CAS 413 relating to the Raytheon transaction; (ii) the Contracting Officer's final decision dated December 12, 2003, reasserting the claim against DIRECTV relating to the Raytheon transaction and demanding payment from DIRECTV of $44,454,849, plus interest; (iii) a deemed denial of

DIRECTV's claim dated November 26, 2003, against the United States for an interpretation of contract terms relating to the Raytheon transaction; and (iv) a deemed denial of DIRECTV's claim dated June 21, 2004, against the United States for an interpretation of contract terms relating to the Boeing transaction.

2. The Government actions described above suffer from the fundamental flaw that they ignore DIRECTV's transfers to Raytheon and Boeing of pension assets that far exceed the sum of (a) the pension plan liabilities transferred to those successor companies and (b) the government's share of the pension plan surpluses that existed in DIRECTV's pension plans on the dates of the transfers. Because DIRECTV transferred all of the pension assets and liabilities pertaining to the Defense Segment and the Satellite Segment to Raytheon and Boeing, respectively, no segment closing adjustments (i.e., payments, or credits against future pension costs, for the Government's share of surpluses in DIRECTV's pension plans) under CAS 413 were required. In addition, even if segment closing adjustments were required , DIRECTV calculates, in accordance with the decisions of this Court, that the most the Government could have been entitled to under CAS 413 as segment closing adjustments if no surplus pension assets had been transferred to the successor contractors was approximately $158 million and $47.5 million, in connection with the Raytheon transaction and the Boeing transaction, respectively. In fact, however, DIRECTV transferred more than $2.4 billion of surplus assets to Raytheon and more than $800 million of surplus assets to Boeing. In all, DIRECTV transferred more than $3.2 billion of surplus assets to Raytheon and Boeing, the successors in interest to the Defense and Satellite Segments' Government contracts, and future pension costs chargeable to the Government by Raytheon and Boeing have been and will continue to be reduced as a result of these transfers. Accordingly, the Government has already received the benefit of any segment closing adjustments to which it was entitled. Indeed, on information and belief, the Government has already received far in excess of any benefit it was due, and its current claim for millions of dollars more from DIRECTV contravenes not only CAS 413 but any notion of fairness and common sense.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, 41 U.S.C. § 601, et seq. ("Contract Disputes Act").

**PARTIES**

4. Plaintiff, The DIRECTV Group, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California. Prior to March 16, 2004, The DIRECTV Group, Inc. was known as Hughes Electronics Corporation. (The DIRECTV Group, Inc. and Hughes Electronics Corporation are collectively referred to herein as "DIRECTV.")

5. Defendant is the United States of America (hereafter, the "United States" or "Government") acting, *inter alia*, by and through its Department of Defense and the Defense Contract Management Agency, formerly known as the Defense Logistics Agency, Defense Contract Management Command.

**SUMMARY OF FACTS**

**Background**

6. DIRECTV was founded as Hughes Aircraft Company in 1932. Until recently, DIRECTV was a major manufacturer of electronics, satellites, missiles, radars and other products and services which it sold to the United States, to foreign governments, and to foreign and domestic commercial customers. In 1997, DIRECTV was one of the largest defense contractors in the nation.

7. During its over seventy year existence, DIRECTV has conducted its business through a variety of business units, divisions, subsidiaries, segments, and intermediate home offices, its organizational structure having been changed on numerous occasions.

8. From 1979 through 1997, Government contracts accounted annually for between 56% and 92% of DIRECTV's total sales. Between 1998 and 2000, Government contracts accounted annually for between 6% and 13% of DIRECTV's total sales.

9. Over the years, DIRECTV's Government contracts have been of both the "fixed price" type and the "flexibly priced" type. From 1979 to 1997, flexibly priced Government contracts accounted for between 23% and 35% of DIRECTV's total annual sales. Between 1998

and 2000, flexibly priced Government contracts accounted for between 0% and 7% of DIRECTV's total annual sales.

10. In 1951, DIRECTV instituted a qualified defined benefit pension plan for many of its employees, which was split into two plans in 1980 (the two plans together with the initial plan, collectively, "DIRECTV Plans"). DIRECTV maintained the DIRECTV Plans from 1951 and at all times relevant to this action. Under the DIRECTV Plans, the employee benefits to be paid or the basis for determining the benefits to be paid were established in advance, and DIRECTV made contributions to the DIRECTV Plans in amounts intended to sufficiently provide for the stated employee benefits.

11. Over the years, the costs of the DIRECTV Plans were accounted for on a composite basis and were allocated to the segments and home offices whose employees were included in the DIRECTV Plans, and thereafter charged to the Government contracts and other cost objectives of those segments, in accordance with the accounting practices and standards then applicable to Government contracts and DIRECTV.

12. Through prudent investment and unexpectedly healthy growth in the stock market, from 1992 through 2000, the DIRECTV Plans were fully funded. As a result, no pension costs arising from the DIRECTV Plans were charged to Government contracts after 1992.

13. Prior to August 1, 1990, all DIRECTV employees were required to make contributions to the DIRECTV Plans. Beginning August 1, 1990, newly hired employees were no longer required to contribute to the DIRECTV Plans and, effective January 1, 1991, employees hired prior to August 1, 1990, were allowed to choose whether to continue contributing to the DIRECTV Plans or to cease their contributions and receive a reduced benefit. Most employees given this choice opted to continue their contributions to the DIRECTV Plans.

14. Employee contributions far exceeded employer contributions in many years, and employee contributions accounted for 100% of the total contributions to the DIRECTV Plans after 1992. Employee contributions accounted for approximately 51% of the total contributions

to the DIRECTV Plans from inception through November 30, 1997, and for approximately 52% of the total contributions from inception through November 30, 2000.

15. As of December 17, 1997, the date of the Raytheon transaction, the DIRECTV Plans had accrued actuarial liabilities of approximately $4.8 billion and plan assets of approximately $7.6 billion. Thus, on that date, the plans had a funding surplus of approximately $2.8 billion over accrued actuarial liabilities.

16. As of October 6, 2000, the date of the Boeing transaction, the DIRECTV Plans had accrued actuarial liabilities of approximately $1.4 billion and plan assets of approximately $2.3 billion. Thus, on that date, the plans had a funding surplus of approximately $900 million over accrued actuarial liabilities.

**Transfer of the Defense Segment**

17. Effective December 17, 1997, DIRECTV completed the Raytheon transaction, a spin off of the Defense Segment that was immediately followed by a merger of the Defense Segment with Raytheon. Pursuant to the terms of the merger, Raytheon assumed responsibility for performance of the Defense Segment's Government contracts, and the operations of the Defense Segment continued uninterrupted.

18. In connection with the Raytheon transaction, DIRECTV transferred all of the DIRECTV Plans' assets and liabilities pertaining to the Defense Segment to Raytheon. Actuarial accrued liabilities of $3,310,028,559 pertaining to the Defense Segment's current employees, vested terminated employees and retirees (approximately 75% of the DIRECTV Plans' total liabilities) were transferred to new pension plans established by Raytheon for the Defense Segment ("Raytheon Plans"). At the same time, DIRECTV transferred to Raytheon all of the pension assets pertaining to the Defense Segment (approximately 75% of the DIRECTV Plans' assets, or $5,771,415,313), including surplus assets of $2,461,386,754.

19. Of the approximately 25% of the DIRECTV Plans' assets and liabilities retained by DIRECTV, significant portions were associated with DIRECTV's Satellite Segment and corporate home office which continued to perform a substantial amount of work on CAS-covered Government contracts.

**Transfer of the Satellite Segment**

20. Effective October 6, 2000, DIRECTV sold the Satellite Segment to Boeing. In conjunction with the sale, Boeing assumed responsibility for performance of the Satellite Segment's Government contracts, and the operations of the Satellite Segment continued uninterrupted.

21. In connection with the Boeing transaction, DIRECTV transferred all of the DIRECTV Plans' assets and liabilities pertaining to the Satellite Segment to Boeing. Actuarial accrued liabilities of $1,037,344,156 pertaining to the Satellite Segment's current employees, vested terminated employees and retirees (approximately 79% of the DIRECTV Plans' total liabilities) were transferred to new pension plans established by Boeing for the Satellite Segment ("Boeing Plans"). At the same time, DIRECTV transferred to the Boeing Plans all of the pension assets pertaining to the Satellite Segment (approximately 79% of the DIRECTV Plans' assets, or $1,840,854,977), including surplus assets of $803,510,821.

22. Thus, after the Raytheon and Boeing transactions were concluded, DIRECTV had transferred all of the liabilities ($4,347,372,715) and all of the plan assets ($7,612,270,290), including all surplus assets, associated with the Defense and Satellite Segments to Raytheon and Boeing, respectively. DIRECTV retained only approximately 5% of the DIRECTV Plans' assets and liabilities, which were associated with the corporate home office and business units not included in either transaction.

**Cost Accounting Standards**

23. The CAS are promulgated by the Cost Accounting Standards Board ("CASB") pursuant to an exclusive statutory grant of authority. The CASB was originally established by the Defense Production Act Amendments of 1970, Pub.L. No. 91-379, and until 1980, served as an agent of Congress and was chaired by the Comptroller General of the United States. The CASB was empowered to "promulgate cost-accounting standards designed to achieve uniformity and consistency in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts." Defense Production Act Amendments of 1970, Pub.L.

No. 91–379, § 719(g), 1970 U.S.C.C.A.N. 938-39, (84 Stat. 796), (codified at 50 U.S.C. App. § 2168 (repealed 1988)).

24. Funding for the CASB expired on September 30, 1980, when Congress declined to appropriate funds for it. However, the nineteen CAS promulgated by the original CASB, including CAS 413, remained in effect. In 1988, the CASB was reestablished by the Office of Federal Procurement Policy ("OFPP") Act Amendments of 1988, Pub.L. No. 100-679, 102 Stat. 4055 (1988), and was moved to the Executive Branch, where it is chaired by the OFPP Administrator.

25. The CAS are applicable to and binding upon both the Government and DIRECTV to the extent that DIRECTV's Government contracts incorporated specific language making the CAS applicable, such as that currently appearing at section 52.230-2 of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 52.230-2 (2001) (together with prior versions of the same language, "CAS clause").

26. Like other contractual provisions, the language of the CAS clause defines the contractual obligations of the parties. Despite frequent numbering changes, the relevant provisions of the CAS clause have remained substantially the same. More particularly, under subparagraphs (a)(2) and (a)(3) of the CAS clause, DIRECTV was obligated to, *inter alia*, (1) follow consistently its disclosed and established cost accounting practices; (2) comply with all CAS in effect on the date of contract award, or, if DIRECTV submitted cost or pricing data, on the date of final agreement on price; (3) prospectively comply with any new or modified CAS which subsequently became applicable to one of its contracts; and (4) prospectively apply changes in its cost accounting practices that were necessary to comply with a new or modified CAS.

27. Although, pursuant to the CAS clause incorporated in DIRECTV's contracts, DIRECTV was required to comply with any modifications or amendments to CAS, subparagraph (a)(4)(i) of the CAS clause entitles DIRECTV to "an equitable adjustment as provided in the Changes clause of [a] contract if the cost is affected by a change which . . . [DIRECTV] is

required to make to [its] established cost accounting practices," including to implement a new or modified CAS. 48 C.F.R. § 52.230-2(a)(4)(i) (1997).

**CAS 413**

28. In 1977, CAS 413 was originally promulgated by the CASB. 4 C.F.R. § 413 (1978) (later renumbered as 48 C.F.R. § 9904.413). The preamble to CAS 413 states that it was intended to "establish[] the basis for assigning actuarial gains and losses to cost accounting periods and for allocating pension cost to segments of an organization." 42 Fed. Reg. 37191 (Cost Accounting Standards Board, July 20, 1977).

29. Among other things, CAS 413 permits the continued use of composite accounting for pension costs, requiring separate segment-by-segment accounting only in certain narrow, specified situations. The preamble further states: "The Board emphasizes that separate calculations are not routinely required, even though no two segments are likely to be identical with respect to the actuarial factors set forth in the Standard. The Board intends that separate segment calculations will be required only in those instances where they would result in a materially different pension cost allocation to a segment." 42 Fed. Reg. 37191, 37194 (Cost Accounting Standards Board, July 20, 1977).

30. CAS 413 also provides for the determination of "an adjustment of previously-determined pension costs" in the event that a cost accounting segment is closed. As originally promulgated, CAS 413.50(c)(12) provides:

> If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the

> segment. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

31. When an initial allocation of pension assets to segments is necessary, such as in connection with a segment closing for a plan using composite accounting, CAS 413.50(c)(5) governs, providing in pertinent part:

> For a segment whose pension costs are required to be calculated separately pursuant to paragraph (c)(2) of this section, there shall be an initial allocation of a share in the undivided pension fund assets to that segment, as follows:
>
> (i) If the necessary data are readily determinable, the amount of assets to be allocated to the segment shall be the amount of funds contributed by, or on behalf of, the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds; (ii) if the data specified in subdivision (i) of this subparagraph [(c)(5)], are not readily determinable, the actuarial value of the pension fund's assets shall be allocated to the segment in a manner consistent with the actuarial cost method or methods used to compute pension cost.

32. CAS 413 became effective on March 10, 1978, and was to be followed by each covered contractor "on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable." 4 C.F.R. § 413.80 (1978). Pursuant to this provision, CAS 413 first became applicable to DIRECTV on January 1, 1979.

33. On March 30, 1995, the CASB published, as a final rule, revisions to the then existing CAS 413. 60 Fed. Reg. 16534 (Mar. 30, 1995). The revised CAS 413 was codified at 48 C.F.R. § 9904.413 ("1995 CAS 413"). Among other things, significant changes were made to CAS 413.50(c)(12) regarding the adjustment due as a result of a segment closing.

34. In addition to changes impacting the calculation of the segment closing adjustment amount, a safe harbor provision, 1995 CAS 413-50(c)(12)(v), was added providing:

> If a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of

> the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment amount pursuant to this paragraph (c)(12) is required. If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment amount required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor. In either case, the effect of the transferred assets and liabilities is carried forward and recognized in the accounting for pension cost at the successor contractor.

35. This safe harbor provision is illustrated in 1995 CAS 413-60(c)(11). In this illustration, Contractor L sells a segment and "[a]s part of the transfer of ownership, Contractor L also transfers all pension liabilities and assets of the segment to the buyer. Pursuant to 9904.413-50(c)(12)(v), the segment closing adjustment amount for the current period is transferred to the buyer and is subsumed in the future pension cost accounting of the buyer."

36. On August 9, 2001, this Court issued its decision in *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001) interpreting, *inter alia*, CAS 413 in the context of a segment closing, and addressing the applicability of the 1995 amendments to CAS 413. This Court's decision was affirmed by the Court of Appeals for the Federal Circuit in *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003), *cert denied sub nom, General Motors Corp. v. United States*, Supreme Court No. 03-165 (December 1, 2003). Among other things, this Court held that:

(a) the Government is not entitled to a credit of any pension surplus that is attributable to employee contributions;

(b) the Government is not entitled to a credit of any pension surplus that is attributable or paid under contracts that pre-date the effective date of CAS 413.50(c)(12);

(c) the Government is not entitled to a credit of any pension surplus that is not attributable to pension costs reimbursed by the Government, such as pension costs allocated to commercial or foreign contracts;

(d) prior to the amendment of CAS 413 in 1995, the Government was not entitled to a credit of any pension surplus that was attributable to fixed priced Government contracts; and

(e) in a situation in which no pension costs were charged to Government contracts after the 1995 CAS amendments, and the entire portion of the pension surplus that is attributable to CAS-covered contracts arose under contracts that contain only the original CAS 413 segment closing provision (as is the case here), the application of the 1995 CAS 413 segment closing provision amounts to a change in cost accounting practice that triggers the CAS clause, FAR 52.230-2(a)(4), and entitles the contractor to an equitable adjustment under FAR 52.230-2(a)(4)(i) equal to any amount for which the contractor might be liable to the government under 1995 CAS 413-50(c)(12) that is over and above the amount for which the contractor would have been liable under the original CAS 413.50(c)(12).

37. By memorandum dated July 23, 2004, the Government issued its "DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments" (the "Joint Guidance"). The Joint Guidance reaffirms and implements the holdings of this Court in its *Teledyne* decision, and provides additional instructions and sample calculations. The Joint Guidance further recognizes that in a situation in which no pension costs were charged to Government contracts after the 1995 CAS amendments, and the entire portion of the pension surplus attributable to CAS-covered contracts arose under contracts containing only the original CAS 413 segment closing provision (as is the case here), the equitable adjustment required by the *Teledyne* decision can be implemented by applying the original CAS 413, thereby "compress[ing] the *Teledyne* decision's three steps into a mathematically equivalent one-step calculation." Joint Guidance at 2.

**The First Final Decision**

38. By letter dated September 30, 2003, the Contracting Officer issued a final decision, denominated as a "Finding of Noncompliance with Cost Accounting Standard 413 (Adjustment and Allocation of Pension Cost)" asserting a Government claim of CAS-noncompliance against DIRECTV ("First Final Decision"). The First Final Decision stated in pertinent part:

> On August 2, 2001, I issued my initial finding of noncompliance with CAS 413 (Adjustment and Allocation of Pension Cost), in that Hughes did not perform an adjustment of pension costs in accordance with the provisions of CAS 413.50(c)(12), and did not properly allocate pension assets to segments in accordance with the provisions of CAS 413.50(c)(5).
>
> After considering Hughes' October 1, 2001 response to my initial finding of noncompliance, I find, pursuant to my authority under FAR 30.602-2, that Hughes is in noncompliance with CAS 413 for failure to perform an adjustment of pension costs in accordance with the provisions of CAS 413.50(c)(12). . . .
>
> This determination of CAS noncompliance is a final decision of the Contracting Officer.

The First Final Decision further demanded that DIRECTV calculate a segment closing adjustment pursuant to CAS 413.50(c)(12).

**Defense Segment Closing Calculation**

39. Because DIRECTV transferred all of the plan assets and liabilities pertaining to the Defense Segment to Raytheon, no segment closing adjustment was required. In addition, the Raytheon transaction did not constitute a "segment closing" within the meaning of the original CAS 413 because DIRECTV transferred all of the plan assets pertaining to the Defense Segment to Raytheon and did not retain responsibility for the pensions of the transferred employees or for the contracts over which the gains and losses attributable to the government share of pension costs would ordinarily be amortized.

40. Nevertheless, on November 26, 2003, in response to the First Final Decision, DIRECTV submitted to the Contracting Officer a segment closing calculation for the Defense Segment prepared in accordance with CAS 413.50(c)(12) and the *Teledyne* decisions ("Defense

Segment Closing Calculation") as if DIRECTV had transferred no surplus plan assets to Raytheon.

41. The Defense Segment Closing Calculation was prepared in a manner consistent with the Joint Guidance, and the resulting segment closing adjustment amount is substantially identical to what would have resulted under the methodology of the Joint Guidance illustrations.

42. As the Defense Segment Closing Calculation details, at the time of the Raytheon transaction, DIRECTV performed an initial allocation of pension assets to segments in accordance with CAS 413.50(c)(5). Because the data required to reconstruct pension assets attributable to the Defense Segment were not readily determinable within the meaning of CAS 413.50(c)(5)(i), the market value of the plans' assets was allocated between the Defense Segment and business units remaining with DIRECTV as of the time of the transaction in accordance with CAS 413.50(c)(5)(ii).

43. DIRECTV transferred to Raytheon *all* of the plan assets, including the entire asset surplus, allocated to the Defense Segment. Over $5.7 billion in pension assets – including over $2.4 billion in surplus assets – were transferred to Raytheon. No plan assets pertaining to the Defense Segment were retained by DIRECTV.

44. Among other things, the Defense Segment Closing Calculation demonstrates that even if no assets had been transferred to Raytheon and the entire $2.4 billion in surplus assets had been retained in the DIRECTV Plans, the amount the Government could have recovered from DIRECTV (i.e., the "Government's share" of the segment closing adjustment amount) would have been approximately $158 million, only 6.41% of the Defense Segment asset surplus, after properly excluding the significant contributions to the DIRECTV Plans made (a) by employees (approximately 51% of total plan contributions), (b) on account of contracts that pre-date CAS 413 (approximately 26% of total plan contributions) and (c) on account of non-Government contracts and fixed price Government contracts awarded before the effective date of 1995 CAS 413 (approximately 16% of total plan contributions).

45. Although the Defense Segment Closing Calculation assumed no surplus assets were transferred by DIRECTV to Raytheon, in fact, DIRECTV transferred surplus assets of

$2,461,386,754, more than fifteen times the Government's share of the segment closing adjustment, to Raytheon for the Government's future benefit. Thus, as in the example in 1995 CAS 413-60(c)(11), the segment closing adjustment amount was transferred to Raytheon, the successor contractor, and was subsumed in Raytheon's future pension cost accounting.

46. Because the Raytheon Plans were thus overfunded, on information and belief, by November 30, 2001, the Government had already saved between $363 million and $589 million as a direct result of DIRECTV's transfer of surplus assets to Raytheon, and additional future Government savings are expected.

**DIRECTV's First Claim**

47. On November 26, 2003, DIRECTV also submitted to the Contracting Officer a Claim for Interpretation of Contract Terms Pursuant to the Contract Disputes Act, demanding, as a matter of right, an interpretation of the applicable provisions of CAS and DIRECTV's Government contracts and a final decision determining that DIRECTV has no liability to the Government for any payment or contract adjustment pursuant to CAS 413 in connection with the transfer of the Defense Segment to Raytheon ("DIRECTV First Claim"). Pursuant to Section 6(c)(1) of the Contract Disputes Act, DIRECTV demanded a final decision within 60 days which, if the claim were denied, would include a statement of the supporting rational for such decision in accordance with Section 6(a) of the Contract Disputes Act and FAR 33.211(a)(4).

48. More than 60 days have passed since the DIRECTV First Claim was submitted, yet the Contracting Officer has failed to issue a final decision on the DIRECTV First Claim as required by the Contract Disputes Act. Pursuant to 41 U.S.C § 605(c)(5), this failure is deemed to be a decision by the Contracting Officer denying the DIRECTV First Claim and authorizes the commencement of a suit in this Court on the DIRECTV First Claim.

**The Second Final Decision**

49. By letter dated December 12, 2003, the Contracting Officer issued a Contracting Officer's Final Decision and Demand for Payment in the amount of $68,695,891 ("Second Final Decision"). According to the Second Final Decision, the amount demanded represents (a) the

Government's share of the over-funded DIRECTV Plans at the time of the Raytheon transaction of $44,454,849, plus (b) $24,241,042 in interest from December 17, 1997 through December 12, 2003.

50. The Second Final Decision claimed that the Defense Segment Closing Calculation provided by DIRECTV, relied on the "wrong CAS version" and asserted a monetary demand against DIRECTV "based on the Government's rough order of magnitude cost impact analysis." However, the Second Final Decision contained no explanation of how the amount demanded was calculated.

51. Despite numerous requests, the Government has refused to provide any insight into how this number was derived. For example, on December 17, 2003, just days after receipt of the Second Final Decision, DIRECTV emailed the Government a request for more information regarding the amount demanded, including:

> 1. What is the basis of the $44,454,849 adjustment?
>
> 2. Does the $44,454,849 adjustment take into account that a portion of the surplus retained by [DIRECTV] was attributable to defense businesses that were later sold to Boeing?
>
> 3. Please provide detailed calculations of the $44,454,849 government share and the $24,241,042 interest.
>
> 4. Does the computation of the government share reflect the decisions in the Teledyne case?
>
> 5. If the answer to number 4 is no, why is Teledyne not incorporated into the computation?
>
> 6. If the answer to number 4 is yes: The Teledyne decision held that where, as in the case of Hughes, the pension plans were fully funded prior to 1995 and the government consequently paid no pension costs on post-1995 contracts, the Contractor is entitled to an equitable adjustment for the difference in result obtained by applying the original and the revised CAS 413. Does the computation of the government share reflect this equitable adjustment?

To date, no answers have been received to these or other questions regarding the reasoning behind and basis for the Government's demand for $68,695,891.

**Satellite Segment Closing Calculation**

52. Because DIRECTV transferred all of the plan assets and liabilities pertaining to the Satellite Segment to Boeing, no segment closing adjustment was required. In addition, the Boeing transaction did not constitute a "segment closing" within the meaning of the original CAS 413 because DIRECTV transferred all of the plan assets pertaining to the Satellite Segment to Boeing and did not retain responsibility for the pensions of the transferred employees or for the contracts over which the gains and losses attributable to the government share of pension costs would ordinarily be amortized.

53. Nevertheless, on March 31, 2004, in response to a request by the Contracting Officer, DIRECTV submitted to the Contracting Officer a segment closing calculation for the Satellite Segment prepared in accordance with CAS 413.50(c)(12) and the *Teledyne* decisions ("Satellite Segment Closing Calculation") as if DIRECTV had transferred no surplus plan assets to Boeing.

54. The Satellite Segment Closing Calculation was prepared in a manner consistent with the Joint Guidance, and the resulting segment closing adjustment amount is substantially identical to what would have resulted under the methodology of the Joint Guidance illustrations.

55. As the Satellite Segment Closing Calculation details, at the time of the Boeing transaction, DIRECTV performed an initial allocation of pension assets to segments in accordance with CAS 413.50(c)(5). Because the data required to reconstruct pension assets attributable to the Satellite Segment were not readily determinable within the meaning of CAS 413.50(c)(5)(i), the market value of the plans' assets was allocated between the Satellite Segment and business units remaining with DIRECTV as of the time of the transaction in accordance with CAS 413.50(c)(5)(ii).

56. DIRECTV transferred to Boeing *all* of the plan assets, including the entire asset surplus, allocated to the Satellite Segment. Over $1.8 billion in pension assets – including over $800 million in surplus assets – were transferred to Boeing. No plan assets pertaining to the Satellite Segment were retained by DIRECTV.

57. Among other things, the Satellite Segment Closing Calculation demonstrates that even if no assets had been transferred to Boeing and all surplus assets had been retained in the DIRECTV Plans, the amount the Government could have recovered from DIRECTV (i.e., the "Government's share" of the segment closing adjustment amount) would have been approximately $47.5 million, only 5.89% of the Satellite Segment asset surplus, after properly excluding the significant contributions to the DIRECTV Plans made (a) by employees (approximately 52% of total plan contributions), (b) on account of contracts that pre-date CAS 413 (approximately 25% of total plan contributions) and (c) on account of non-Government contracts and fixed price Government contracts signed before the effective date of 1995 CAS 413 (approximately 16% of total plan contributions).

58. Although the Satellite Segment Closing Calculation assumed no surplus assets were transferred by DIRECTV to Boeing, in fact, DIRECTV transferred surplus assets of $803,510,821, more than sixteen times the Government's share of the segment closing adjustment, to Boeing for the Government's future benefit. Thus, as in the example in 1995 CAS 413-60(c)(11), the segment closing adjustment amount was transferred to Boeing, the successor contractor, and was subsumed in Boeing's future pension cost accounting.

59. As was the case with the Raytheon transfer, because the Boeing Plans were thus overfunded, the Government has likely already saved more than the segment closing adjustment amount as a direct result of DIRECTV's transfer of surplus assets to Boeing, and additional future Government savings are expected.

**DIRECTV's Second Claim**

60. On June 21, 2004, DIRECTV submitted to the Contracting Officer a Claim for Interpretation of Contract Terms Pursuant to the Contract Disputes Act, demanding, as a matter of right, an interpretation of the applicable provisions of CAS and DIRECTV's Government contracts and a final decision determining that DIRECTV has no liability to the Government for any payment or contract adjustment pursuant to CAS 413 in connection with the transfer of the Satellite Segment to Boeing ("DIRECTV Second Claim"). Pursuant to Section 6(c)(1) of the Contract Disputes Act, DIRECTV demanded a final decision within 60 days which, if the claim

were denied, would include a statement of the supporting rational for such decision in accordance with Section 6(a) of the Contract Disputes Act and FAR 33.211(a)(4).

61. More than 60 days have passed since the DIRECTV Second Claim was submitted, yet the Contracting Officer has failed to issue a final decision on the DIRECTV Second Claim as required by the Contract Disputes Act. Pursuant to 41 U.S.C § 605(c)(5), this failure is deemed to be a decision by the Contracting Officer denying the DIRECTV Second Claim and authorizes the commencement of a suit in this Court on the DIRECTV Second Claim.

**This Action**

62. DIRECTV timely files this action contesting the First Final Decision, the Second Final Decision, and the deemed denials of the DIRECTV First Claim and the DIRECTV Second Claim in accordance with 41 U.S.C. § 609(a).

**COUNT I**

63. Because DIRECTV transferred to Raytheon all of the pension assets and liabilities pertaining to the Defense Segment as part of the transfer of ownership of the Defense Segment, no CAS 413 segment closing adjustment is necessary or required in connection with the Raytheon transaction.

**COUNT II**

64. Because DIRECTV transferred to Boeing all of the pension assets and liabilities pertaining to the Satellite Segment as part of the transfer of ownership of the Satellite Segment, no CAS 413 segment closing adjustment is necessary or required in connection with the Boeing transaction.

**COUNT III**

65. The entire portion of the pension surplus attributable to DIRECTV's CAS-covered contracts arose under contracts including only the original version of CAS 413. Therefore, the calculation of DIRECTV's liability for a segment closing adjustment under 1995 CAS 413-50(c)(12) is a government-imposed change in DIRECTV's accounting practices and, pursuant to the CAS clause, DIRECTV is entitled to an equitable adjustment for any increased

liability caused by compliance with the 1995 CAS revisions. Thus, DIRECTV's liability for any segment closing adjustment is limited to the amount calculated under the original version of CAS 413.

**COUNT IV**

66. Because DIRECTV transferred all of the plan assets and liabilities pertaining to the Defense Segment to Raytheon and did not retain responsibility for the pensions of the transferred employees, and because the new segment owner, Raytheon, assumed responsibility for the pension plans covering the transferred segment and its employees as well as for the contracts over which the gains and losses attributable to the Government's share of pension costs can be amortized, the Raytheon transaction did not constitute a "segment closing" within the meaning of the original version of CAS 413. If there were a liability caused by compliance with the 1995 CAS revisions, that liability would be offset by an equitable adjustment due DIRECTV under FAR 52.230-2(a)(4)(i), and DIRECTV would have no liability to the Government for any segment closing adjustment amount in connection with the Raytheon transaction.

**COUNT V**

67. Because DIRECTV transferred all of the plan assets and liabilities pertaining to the Satellite Segment to Boeing and did not retain responsibility for the pensions of the transferred employees, and because the new segment owner, Boeing, assumed responsibility for the pension plans covering the transferred segment and its employees as well as for the contracts over which the gains and losses attributable to the Government's share of pension costs can be amortized, the Boeing transaction did not constitute a "segment closing" within the meaning of the original version of CAS 413. If there were a liability caused by compliance with the 1995 CAS revisions, that liability would be offset by an equitable adjustment due DIRECTV under FAR 52.230-2(a)(4)(i), and DIRECTV would have no liability to the Government for any segment closing adjustment amount in connection with the Boeing transaction.

**COUNT VI**

68. Because DIRECTV transferred to Raytheon assets far in excess of the sum of the liabilities transferred and the Government's share of the segment closing adjustment amount

calculated in accordance with the original version of CAS 413 as if no surplus plan assets had been transferred to Raytheon, any necessary segment closing adjustment has been made and DIRECTV owes nothing to the Government in connection with the Defense Segment closing.

**COUNT VII**

69. Because DIRECTV transferred to Boeing assets far in excess of the sum of the liabilities transferred and the Government's share of the segment closing adjustment amount calculated in accordance with the original version of CAS 413 as if no surplus plan assets had been transferred to Boeing, any necessary segment closing adjustment has been made and DIRECTV owes nothing to the Government in connection with the Satellite Segment closing.

**COUNT VIII**

70. DIRECTV's cost accounting practices are in compliance with CAS 413, 48 C.F.R. § 9904.413, and any noncompliance has not resulted in increased costs paid by the United States.

WHEREFORE, for the reasons set forth above, DIRECTV prays for relief as follows:

1. That the Court declare that DIRECTV's cost accounting practices are in compliance with CAS 413, 48 C.F.R. § 9904.413, or, alternatively, that any noncompliance has not resulted in increased costs paid by the United States.

2. That the Court determine that DIRECTV has no liability to the United States for any adjustment amount determined by the Government in accordance with 1995 CAS 413.50(c)(12) which exceeds DIRECTV's liability determined in accordance with the original version of CAS 413 because DIRECTV is entitled to an equitable adjustment in the full amount of the difference, plus any applicable interest, as the result of the change in the CAS applicable to DIRECTV.

3. That the Court determine that DIRECTV has no liability to the United States for any segment closing adjustment in connection with the Raytheon transaction because, alternatively, (1) DIRECTV transferred all of the pension plan assets and actuarial accrued liabilities pertaining to the closed Defense Segment to Raytheon, the successor contractor for the

Defense Segment; (2) under original CAS 413 the Raytheon transaction was not a "segment closing" and DIRECTV would be due an equitable adjustment under the CAS clause equal to any increased liability caused by compliance with 1995 CAS 413; or (3) DIRECTV transferred to Raytheon surplus assets in excess the Government's share of any segment closing adjustment due in connection with the Raytheon transaction.

4. That the Court determine that DIRECTV has no liability to the United States for any segment closing adjustment in connection with the Boeing transaction because, alternatively, (1) DIRECTV transferred all of the pension plan assets and actuarial accrued liabilities pertaining to the closed Satellite Segment to Boeing, the successor contractor for the Satellite Segment; (2) under original CAS 413 the Boeing transaction was not a "segment closing" and DIRECTV would be due an equitable adjustment under the CAS clause equal to any increased liability caused by compliance with 1995 CAS 413; or (3) DIRECTV transferred to Boeing surplus assets in excess of the Government's share of any segment closing adjustment due in connection with the Boeing transaction.

5. That the Court deny the claims of the Government against DIRECTV asserted in the First Final Decision and the Second Final Decision.

6. That the Court grant the claims of DIRECTV against the Government asserted in the DIRECTV First Claim and the DIRECTV Second Claim.

7. That the Court award costs, attorney fees, and such other and further relief as the Court may deem just and equitable in the circumstances.

Respectfully submitted,

Alexander F. Wiles
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010
(310) 203-7199 (fax)

Attorney of Record for
THE DIRECTV GROUP, INC.

OF COUNSEL:
Alan C. Brown
DUANE MORRIS LLP
1667 K Street N.W., Suite 700
Washington, DC 20006-1608
(202) 776-7893
(202) 776-7801 (fax)

M. Ruth M. Madrigal
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010
(310) 203-7199 (fax)

Dated: September 3, 2004