**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **THE DIRECTV GROUP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 04-1414C** |
| | ) | **(Judge Firestone)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DIRECTV'S LODGING OF TRANSCRIPT**
**OF NOVEMBER 30, 2007 TELEPHONIC STATUS CONFERENCE**

As set forth in The DIRECTV Group's ("DIRECTV") January 7, 2008 Status Report, DIRECTV Group hereby lodges the attached Transcript of the November 30, 2007 telephonic Status Conference in this matter. DIRECTV respectfully directs the Court to pages 9-12 and 34-37 of the Transcript, which address the procedural issues concerning the scope of DIRECTV's anticipated summary judgment motion discussed in the parties' respective Status Reports.

Respectfully submitted,

/s/

ALEXANDER F. WILES
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010
(310) 203-7199 (fax)

OF COUNSEL:

ALAN C. BROWN
Enterprise Business Law Group LLC
8270 Greensboro Drive
McLean, VA 22102

Dated: January 16, 2008

UNITED STATES
COURT OF FEDERAL CLAIMS

DIRECTV GROUP, INC., )
)
Plaintiff, )
)
v. ) Docket No.: 04-1414C
)
UNITED STATES, )
)
Defendant. )

Live Tape

(The following transcript was transcribed from a digital recording provided by the U.S. Court of Federal Claims to Heritage Reporting Corporation on January 7, 2008.)

Pages: 1 through 37

Place: Washington, D.C.

Date: November 30, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIRECTV GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 04-1414C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Suite 613, Chambers
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday,
November 30, 2007

The parties met, pursuant to notice of the Court, at 11:32 a.m.

BEFORE: HONORABLE NANCY B. FIRESTONE
Judge

Live Tape

(The following transcript was transcribed from a digital recording provided by the U.S. Court of Federal Claims to Heritage Reporting Corporation on January 7, 2008.)

APPEARANCES: (Via Telephone)

For the Plaintiff:

ALEXANDER WILES, Esquire
ALAN HEINRICH, Esquire
ALAN BROWNE, Esquire
Irell & Manella
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 203-7758

For the Defendant:

COLEMAN BIRD, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530

P R O C E E D I N G S

(11:32 a.m.)

THE COURT: Well, good morning, everyone. Why don't we go around the table, as it were? For the Plaintiff, Mr. Wiles.

MR. WILES: I am on, and with me is my colleague, Alan Heinrich.

THE COURT: Okay.

MR. HEINRICH: Good morning.

THE COURT: Good morning. Mr. Brown?

MR. BROWNE: Yes, I'm here, Your Honor.

THE COURT: Okay. And, Mr. Bird, how are you?

MR. BIRD: Good morning, Your Honor. I believe Mr. Rabin is also on the line.

MR. RABIN: Good morning, Your Honor.

THE COURT: Good morning, Mr. Rabin.

Okay. Well, the reason I thought we needed to chat is, I have been, now that we're heading into a holiday season, just optimistic that, by the end of this year, that we would have seen a settlement in this case, and I'm now recognizing, from the status report, Mr. Wiles, that apparently you guys are anxious to settle this case, but it sounds like, Mr. Bird, the government has worries or issues that Mr.

Wiles is getting frustrated, he can't seem to address.

So, Mr. Wiles, why don't you tell me where you think things are, and then, Mr. Bird, you can explain to me why you think things have sort of slowed down a bit, and then we'll come up with a schedule to see what we can do to resolve them?

So, Mr. Wiles, what you've provided them, you believe, with the data that they need to make an intelligent decision using sort of the Teledyne formula. Is that what you're saying?

MR. WILES: Correct.

THE COURT: All right.

MR. WILES: Our client, as we said in the report, our client retained the actuary, and its actuary included, informally, way back in early 2005, that the amount of money at stake in this litigation was a very, very small fraction of what the government thought.

So we met with Mr. Bird and his colleagues. There was a very large meeting in Washington in May of 2005, and our actuary presented his informal analysis and said that he could demonstrate this formally if the parties thought that that made sense and could lead to a settlement.

Sometime after May 2005, Mr. Bird and I

conferred, and he indicated that he thought it did make sense, and, obviously, we thought it made sense.

So the goal was really to get the parties on the same wavelength with respect to how much money is at stake in this case because the government's reports were not done in a way that was sound numerically.

THE COURT: All right. Since they are using usually numbers that originally came from the company, tell me what sort of happened. Give me a little bit more detail. I'm trying to figure out --

MR. WILES: I can't really explain the numerical calculations in the report because they were not set out in a way that either I or our actuaries could really understand it, except I think what they did is that they made some assumptions about the data that didn't pan out.

THE COURT: Okay

MR. WILES: Actually, I don't think that's the controversy because Mr. McQuaid, our actuary, did the report. We presented it to the government at the end of 2005, and they got in January of 2006, and then Mr. McQuaid met with their actuaries to go over his methodology. The actuaries had no problem with his methodology. They agreed with it, so then it was just a matter of checking the underlying numbers that he

was relying on, the data that he was relying on, and the government wanted to sample that. They concluded that statistical sampling was the best way to check that.

Then there was an extensive period of discussion and debate about what kind of sampling plan was really necessary, and I think the lawyers for the government played a very constructive role in having DCAA come up with a sampling plan that was not so onerous as the Directv that we would just look at it and say, you know, this is too expensive for a settlement process.

So there was a constructive relationship. We wound up doing the sampling exercise. The government devised one that we were perfectly happy with. We wound up giving them the data so they could do the sampling exercise. That occurred in early 2006. They developed a sampling plan, and we gave them the data in January. It took them a few months. One could say, "Gee, why did it take so long?" but that's really not relevant.

By May of 2007, the government communicated to us essentially that they saw no major problems with Mr. McQuaid's work that had been turned over to them 14 to 15 months earlier.

So we scheduled a meeting in --

THE COURT: -- July, yes.

MR. WILES: That was in July, and we came with a tentative proposal. We have, like the government, we have sort of a chain of command to deal with, and we felt, again, like the government, that we only wanted to go up that chain of command completely, once we had something that, at least, Mr. Bird and Mr. Rabin were prepared to recommend.

So we made a proposal that was acceptable to the chain of the people we were dealing with at Directv, and Mr. Bird indicated that he could not recommend that, and we indicated, quite clearly, that it wasn't a take-it-or-leave-it proposal. It couldn't be because we hadn't even run it up the complete flagpole and that everybody in the room was willing to listen to a counterproposal.

At that point, the government, Mr. Bird, took the position that, well, gee, I can't really make a counterproposal because no one has ever audited the Teledyne share numbers that are used in Mr. McQuaid's calculation that was given to them in January of 2006.

We were sort of flabbergasted at that because not only were the Teledyne numbers in that proposal, but the Teledyne numbers were in Mr.

McQuaid's segment's closing analyses that were first provided to the government, if my memory is right, in the middle of 2003 for one of the transactions and early 2004 for the other transaction.

Mr. Bird said he thought that could be done relatively quickly. So we left and said, Call us back when you're done and with the proposal, and the only thing we've heard since that point is, We need more extensions.

So we have no idea, first of all, whether Mr. Bird is prepared to give us the number that he is willing to recommend, in the event that the Teledyne numbers that Mr. McQuaid calculated are correct; and, second of all, we have no idea when or if the government will finish its Teledyne numbers audit, whatever that is. They didn't ask for any data from us. It was pretty clear that they had all of the data they needed to do this. That was July.

So when these dates keep passing, I think you get the impression, on our side, that there isn't all that much serious interest in trying to resolve this case, although, frankly, from my perspective, even not as Directv's counsel, I'm sort of bizarrely confused as to why there isn't interest because really this case is a small one compared to the bigger ones

that are in front of Your Honor, and there is no reason why the government should be having to consider things like whether its position in our case is inconsistent with its position in the other cases, which is one of a couple of issues.

It is, and it doesn't make any sense for us for the government to continue this case, given what I think both the actuaries on our side and their side believe is at stake in the case.

All of that led us to the conclusion that really maybe the problem is that we just need to have a schedule, a schedule that requires the parties to actually do the work normally associated with litigation, sets out a summary judgment schedule.

Effectively, there's two issues in our case. One is the surplus-transfer issue that Your Honor is well aware of -- I've brought some transcripts from the other cases -- and it's our belief that, given the massive amount of surplus that Directv transferred, that if the Court requires the government to give the contractor some benefit for the value that the government receives as a result of the surplus transfers to the purchasing contractor, Directv will readily be able to demonstrate that the amount of value that the government has received from the

surplus transfer exceeds, vastly exceeds, the check that Directv would have had to write if it had transferred no surplus and just written a check for Teledyne's share.

So we think, on the surplus-transfer issue, there is a relatively, at some point down the road after Your Honor rules, that issue will either resolve our case in our favor or will be a nonissue if Your Honor rules in favor of Mr. Bird's position.

The other issue in our case --

THE COURT: Back up one second. Is the proposal that you've put on the table now ignoring the surplus-transfer issue?

MR. WILES: Actually, while I would rather not get into the specifics, I'm happy to tell you that, yes, what it did say to the government was that we would do the calculations in a way that assumes the government prevails.

THE COURT: That's what I'm saying. For the purposes of settlement, that's what you've been willing, yes --

MR. WILES: Yes. That's exactly our proposal.

THE COURT: Okay. All right. Tell me the second issue, then.

MR. WILES: The second issue is that the reason we're in this case is because the government believes that when Directv started a consumer segment in 1994, Directv should have, at that point, engaged in segment accounting and created a separate segment for the consumer segment, and had it done that, and that's what Mr. McQuaid's settlement calculation was, the government believes that Directv would have had to transfer some additional surplus, a minor amount of additional surplus, but some additional surplus, to the purchasers in the Raytheon and Boeing transactions, and, having failed to transfer that minor amount of additional surplus, the government believes that Directv should have to make a closing payment for the Teledyne share of the surplus that was kept and should have been transferred under this segment-accounting theory.

THE COURT: And you have a proposal on that as well.

MR. WILES: On that one, we feel that the government has very little chance of prevailing, and our proposal on that one was to calculate the settlement amount as though we prevailed on that issue.

THE COURT: Okay.

MR. WILES: So, basically, we split the two issues.

THE COURT: I see. Okay.

MR. WILES: And from the standpoint of assuming we don't settle, we believe that that's a relatively simple summary judgment issue as well, and Mr. Brown will correct me if I get this wrong, but I believe the primary reason we believe that that is simple is that Directv did not charge the government for any pension costs after 1994, when it set up the consumer segment, so it's effectively, under CAS, no harm, no foul.

THE COURT: I see. There is a zero sum. Okay.

MR. WILES: Right. Exactly. So our view is, gee, it really would have been nice. We're frustrated by the fact that we haven't been able to settle, but maybe we need to just go through the regular rigors of litigation now for six months or something and do discoveries, set up a schedule for rational briefing on the summary judgment issues that we perceive are relevant. If the government has some issue that it wants to put on the table, obviously, it can do that.

What we suggest, in our status conference

statement, is simply that Your Honor set a date for the parties to file a joint status report with a discovery plan and a summary judgment briefing schedule and the like.

THE COURT: All right. So, Mr. Bird?

MR. BIRD: Yes, Your Honor. I don't know quite know where to start in response to that 15-minute closing argument.

THE COURT: Well, yes.

MR. BIRD: One thing that I would like to point out, Your Honor, is I have to object to Mr. Wiles disclosing the substance of our negotiations, in violation of a confidentiality agreement.

THE COURT: Well, I have no sense of the numbers. What I have a sense is I agree with you. I asked the question in terms of the issues. I asked in terms of the issue involving the surplus-transfer issue because, obviously, that's an issue that the government has and I have, in another case, and the final pieces of paper for that are not coming in until the middle of January. In other words, is that holding things up in terms of resolving that matter?

So you're right. I pried, and --

MR. BIRD: I was not intending to be critical of the Court, Your Honor, only --

THE COURT: Well, when I'm prying, I take responsibility for that.

But meanwhile, back at the ranch, the real question is this: Where it seems as though you folks have some issue that is keeping this from getting resolved, and I'm trying to figure out, is this just simply because there is a lot of calculation that needs to be done, and you're not comfortable with the numbers, or is it really that there are some legal issues keeping you apart that we should just try to put on an expedited schedule to resolve so that we can, you know, move through this?

I had always been under the assumption that there wasn't that much at issue between you other than verifying numbers, and so I was a little bit surprised when I got the status report suggesting that there might be some issues to resolve.

So could you focus on that, Mr. Bird? What are the issues keeping you apart, and how do you think we should be resolving that in quick manner?

MR. BIRD: Your Honor, we were as surprised as well to get the status report because I received a voice mail message from Directv's counsel about 15 minutes before Directv's statement of November 14th was filed with the Court advising us that that was

Directv's intent. But let me respond to the Court's question.

In this case, as in other cases, there are data problems. We live in a world of imperfect data, where the data is simply not available, allegedly. I mean, that's what we were told. These are not data that the government generally keeps; they are kept by contractors.

In terms of the government participation ratio, the problem right now is -- there are other issues as well, but the problem with the government participation ratio under Teledyne is that Directv simply has provided no segmented data whatsoever on this. Instead, they have invited the government to assume that the government participation rate for each of these closed segments was exactly equal to the government's participation rate for the corporation as a whole, in each instance, a very small fraction, less than 10 percent.

Since one of these segments was called the "defense segment," we believe it's not very likely that the government participation ratio for the defense segment, for example, would be the same as the overall percentage for the company as a whole. We are trying to get to the bottom of this.

DCAA has never audited the government's participation ratio provided by Directv previously because the submissions in 2003, the initial submissions, DCAA rejected and simply said, There is nothing here to audit. The whole submissions were so deficient that DCAA didn't have anything to work with.

When we got the January 2006 submission from Mr. McQuaid that Mr. Wiles provided, yes, our actuaries reviewed that, but I made clear, at the July 2007 meeting with counsel, that one of the things that we needed to get to the bottom of -- that I wasn't prepared to make any recommendations to my chain of command with respect to a settlement until I had a better fix on the government participation ratio.

We have been trying to since then to find out what data we might have available within the government and work with that and see if we can come close. We're not asking for perfection.

THE COURT: Let me ask a question, Mr. Bird.

MR. WILES: Your Honor, may I interrupt for a second? Mr. Brown just e-mailed that he got disconnected. Is it possible to slide him in again?

THE COURT: Yes. So what I have to do is put us on hold for a minute. So, Mr. Bird, can you hold that thought?

MR. BIRD: Such as it was, yes, Your Honor.

THE COURT: Well, no, no. It's an important thought, if what you're saying is that you're having a hard time finding the ratio. I'm trying to get a sense from you of what the real issues are, and this is helpful. So can you hold on?

MR. BIRD: Yes. Absolutely.

THE COURT: All right.

(Off the record.)

THE COURT: Okay. We're back. Mr. Bird, so your contention is that you're looking for more data with regard to what the government's share is.

Let me just ask you a question in that regard. How long was that defense segment in existence, the defense organization thing that you're referring to?

MR. BIRD: I think it dates back to before 1979, Your Honor.

THE COURT: All right. So that's a long one.

MR. BROWNE: Pardon me, Your Honor. This is Alan Browne. Not correct. That label --

THE COURT: Yes.

MR. BROWNE: -- actually is a phrase that's been used here. There never was something called the

"defense segment." It actually was a creation of the transaction itself with Raytheon where certain segments, a variety of segments, were grouped together into a unit to be sold.

THE COURT: I see. So if I understand, what you're suggesting is that there were different portions of the company doing defense-related work, and then those were pulled out to do.

MR. BROWNE: Correct, Your Honor.

THE COURT: All right.

MR. BROWNE: It consisted of radar systems, ground systems.

MR. BIRD: Your Honor, let me be more specific.

THE COURT: All right.

MR. BIRD: I'm looking at an audit report, and that lists the various business units that were sold, business unit organizations that were sold, to Raytheon, which were called the "defense segment," and I think Your Honor can give some idea of the enormity of the task.

There are essentially five components, and each of the components has at least four subcomponents from various parts of the company, apparently, and that is what was sold. Now, Your Honor can imagine

the complexity of -- this is on page 16 of the audit report -- Your Honor can imagine the difficulty of tracking down, okay, for those -- I'll call them "subunits" -- and those units, what were the pension costs allocated to various types of contracts for the period of time that the original CAS 413 was in effect?

Now, what we're trying to do, and through Mr. Rabin's tireless efforts, he has been able to locate some historical documents from the period from 1980 forward that would reflect the percentage allocations of overhead by various then-existing segments. But the defense segment, as of the year 1997, when it was sold, is not the same thing as these various segments were back in 1980.

THE COURT: Okay.

MR. BIRD: So, in effect, what you're having to do is trace back, through a complicated corporate history that keeps changing about every year or two, where segments were and what they were doing. But those documents that we've been able to locate, through his efforts, and DCAA is scheduled to come in next week and review those documents and see what they can make of them.

But the notion that the government has been

sitting on its hands, that we're just not interested in settling the case because we didn't agree instantly with the participation ratio that Directv proposed, which, as I mentioned, is for the company as a whole, I think, is not well borne out by the facts.

THE COURT: All right. Yes, go ahead.

MR. BIRD: I would also add, Your Honor, that, in addition to the surplus-transfer issue, which is before the Court in the General Electric case, and which, during the pendency of these negotiations with Directv, they filed an amicus brief in the General Electric case, the effect of which, if their position were sustained, then they would have no liability to the government, arguably, no liability whatsoever.

THE COURT: Right.

MR. BIRD: But there is another issue that they haven't mentioned, which is that for one of the transfers, according to their own actuary's, Mr. John McQuaid's, December 15, 2005, analysis, the one that we got in January of 2006, for the satellite segment, Directv transferred approximately $13 million more in assets than were the liabilities of that segment.

So, in effect, they created their own deficit, and now they are asking the government to pay a participation share of that deficit.

THE COURT: I see.

MR. BIRD: So we're saying, wait a minute. The purpose of a 413 segment closing is to correct for past over- or under-contributions of pension costs.

THE COURT: Not to create them.

MR. BIRD: We didn't create that.

THE COURT: I understand.

MR. BIRD: Why should we have to pay a part of it? That's an issue that is in the case and will need to be resolved.

THE COURT: All right.

MR. BIRD: As far as the segmentation issue, which they have identified as a separate legal issue, what the government's position has been is that -- I've even used, I think, this term -- we're prepared to do what I call a "straight-up segment closing adjustment"; that is, we find out what the assets are, we find out what the liabilities are, within reasonable, tolerable limits of error, and we find out the participation ratio, again, within tolerable limits of error.

Right now, we don't have that third piece. We don't have the government participation ratio, any sense of whether the ratio that has been proffered bears any relationship to reality. And the notion

that the government must have all of the data it needs on the government participation ratio because it hasn't asked for any more; that, I think, is contradicted by what happens when we do ask for data.

The reason that it took over nine months to agree on a sampling plan; one of the principal reasons was that Directv adamantly refused to provide the government a routine actuarial data file containing actuarial data for 9,213 individuals. They simply refused. They wouldn't give it to us. They didn't want DCAA to have it, and we had to negotiate and negotiate and negotiate, and, finally, I think we reached a result where the DCAA had to go to the premises of Directv to perform the sampling. That's what we're having to deal with.

THE COURT: How many employees are we talking about, Mr. Bird? Do you know? You've just given me --

MR. BIRD: The universe was 9,213, but that was for an extremely complicated analysis that Mr. McQuaid was doing, which was to try to work backwards from evaluation number in the year 2000 back to 1994 for certain employees and then roll that one forward to figure out what the assets were for what was called the "defense segment" in 1997 and the "satellite

segment" in the year 2000.

The number of employees that were involved is, I believe, over a thousand, but I can't tell you how much over a thousand.

THE COURT: Okay. All right. So it sounds to me, from your perspective, what's holding you apart is not really these legal issues but the fact that you believe that, in essence, the CAS 413 calculation needs to be verified.

MR. BIRD: Exactly, Your Honor.

THE COURT: Okay.

MR. WILES: Your Honor, may I make a comment?

THE COURT: Yes. Go ahead, Mr. Wiles.

MR. WILES: So when Mr. Bird made his comment that what he communicated is that the government is willing to do a "straight-up segment closing adjustment," that's a hidden way of saying that what he wants to do is settle on a basis where, for the two legal issues I described, we concede both of them. Obviously, that's not a settlement; that's a surrender, and that's not something our client is going to be willing to do.

So I would disagree with Mr. Bird that the legal issues are not what's separating us now. I

think, clearly, the legal issues are separating us because we proposed one and one, and his phrasing is a way of saying, "Well, no. Actually, we want you to surrender on both."

THE COURT: Well, actually, maybe I'm missing something because that's not what I'm hearing.

MR. WILES: This was pretty clear. I don't see what you're missing, but what I just said is a conversation that Mr. Bird and I had.

THE COURT: No. I don't disagree that I'm sure that there is a code in which the government wants you to concede both issues, but what I'm finding is the more fundamental disagreement, and maybe I am missing that, is that your analysis, from the outset, is based on an assumption that if you take the pension as a whole, 10 percent is attributable to government work and that from there calculations are being made, and, hence, the numbers are very small.

What I'm gathering what Mr. Bird seems to be suggesting is he is not sure that's true and that, indeed, I can envision a circumstance in which he says that the major contract that led to the major contributions to pension costs was in a segment, and that was 90 percent, and while the overall allocation may be 90/10, that one has the opposite number, in

that greater contributions were made there, and so he cannot simply rely on an assumed, across-the-board 10 percent is attributable to the government.

Now, that's what I was hearing as his major stumbling block, in addition to these legal questions.

MR. BIRD: Exactly, Your Honor.

MR. WILES: And what I would say to that is, first, we would really need an actuary to analyze that question and give a response. It's never been raised before.

The only other thing I can say is that that's highly unlikely because Hughes Aircraft Corporation, which is what Directv used to be, was a defense contractor, and it was the vast bulk, maybe the almost exclusive part of its business for years and years, and so the pension costs that were incurred were incurred by people working on defense contracts. Obviously, some of them were pre-CAS, and some of them were on fixed-price contracts. A significant portion of Directv's pension assets result from employee contributions.

So the notion that there is some vastly distorted calculation of the Teledyne share is just not plausible on these facts.

THE COURT: All right.

MR. WILES: It's not like Hughes Aircraft had two major businesses, one of which was government and one of which was consumer. In fact, the opposite is true. Until 1994, Directv was virtually exclusively in the government contracting business; it was Hughes Aircraft.

THE COURT: All right. So, Mr. Bird, if that --

MR. BIRD: I would have to correct that, at least in two respects. One is that's not an actuarial question; that's an accounting question, and you need to accountants, like from DCAA, we've been saying, to resolve this.

Secondly, it has been raised before. I specifically raised the point at the July meeting that how can we assume that what's true of the whole is true of these two segments, that that doesn't seem to make sense.

THE COURT: All right. I thought I heard you say, Mr. Bird, that the allocation was that only 10 percent was government, and I'm hearing sort of the opposite, which should be that all of it was government.

MR. BIRD: Well, the difference, Your Honor, is when you apply the Teledyne formula because it only

includes the pension costs allocated to flexibly priced contracts entered into subject to the terms of the original CAS 413, which means basically entered into on or after --

THE COURT: -- 1978.

MR. WILES: We agree with that, Your Honor. In other words, what happened here is the company was in the defense business, but when you do the Teledyne calculation, then you exclude employee contributions, and you exclude pre-1979 contributions, and you exclude --

THE COURT: I see.

MR. WILES: -- the fixed-price contracts, it becomes a very small number. The Teledyne share that Mr. McQuaid calculated way back in 2003 and gave to the government is in the neighborhood of six or seven percent, and it's slightly different for each of the two --

THE COURT: All right. Mr. Bird, so tell me, is that a real issue, then, or not a real issue?

MR. BIRD: I think it's a real issue.

THE COURT: Why is it a real issue?

MR. BIRD: It's a real issue because I'm neither an accountant nor an actuary. I need someone who knows what they are doing, as an accountant, to

look at this and look at numbers and say, "You know, six percent is about right," or it's not about right, and we don't have the accounting -- I guess it's a reflection of the fact that the accounting required to do the Teledyne share calculation in a company that is reorganizing -- I wouldn't say all of the time but pretty close to all of the time -- over a 20-year period is immensely difficult, particularly for an organization that has not been using segment accounting.

You're doing composite accounting. You have to --

THE COURT: You have to break it into segments.

MR. BIRD: Exactly. You would have to figure out, okay, now for that segment, what was the contract mix?

THE COURT: But what I'm hearing is that the contract mix was essentially government contract. I'm not hearing that they are making an argument that, unless I'm misperceiving what I just thought I heard, that it was, you know, Hughes Aircraft, and Hughes Aircraft or Hughes, whatever it was called, was essentially a government contractor and that they are not making an argument that these aren't government

contracts. They are just saying, when you take out the Teledyne items, you end up with a small number of really flexibly priced contracts, for which there was reimbursement.

MR. WILES: And, Your Honor, I would add one thing, and, again, Mr. Browne, please correct me if I'm wrong. Directv did not do segment accounting.

THE COURT: Right.

MR. WILES: The company was a defense contractor, and one of the issues in the case is that Mr. Bird contends that, in 1994, when Directv formed a consumer business, it should have done segment accounting.

So the idea that there are multiple segments that need to be accounted for separately in doing the Teledyne share is just wrong. There was one segment.

THE COURT: We're also talking about only a three-year period.

MR. WILES: There were two segments, Your Honor. At a minimum, there was the defense segment and the satellite segment, and we know that the defense segment was not a segment; it was a construct --

THE COURT: I understand.

MR. WILES: -- 15 or 20 subsegments.

MR. BIRD: Your Honor?

THE COURT: All right. Back up. The truth of the matter is, you know, not only am I not an accountant or an actuary; I'm not even that good in math. So, as a result, let's not get into all of those numbers right this moment.

What I want to do is this: Mr. Bird, what is it that you feel you need, in terms of time, because it sounds like there is no other information these people can provide to you for your accountant to feel comfortable with this five-segment divided by additional four groups into figuring out whether or not the Teledyne share, leaving aside the issue of the surplus transfer and what should have been done in 1994, leaving that aside for the moment, whether or not -- those legal issues are not resolved, but what you need so that, at least, when we're going to talk about the legal issues outstanding, that's really what we're talking about and that the accounting has been accomplished? So what do your guys need?

MR. BIRD: Your Honor, I'm not sure I can put an exact timeframe because, as I mentioned, what we've established so far is that they have not previously audited this, and they found the aggregate sales data from the company as a whole to be an

insufficient basis, and they are coming in, as I mentioned, next week to look at some documents.

THE COURT: All right.

MR. BIRD: But we have not gone back to Directv and said, "Here is what we need. Please give us these documents." Directv, I guess, was under the assumption that we had all of the data we need. I'm pretty confident that we don't, but we need their help in describing the data that we do need.

THE COURT: Okay.

MR. WILES: Your Honor?

THE COURT: Yes.

MR. WILES: My perception here is that, at the end of December 2005, we gave the government a document that had Mr. McQuaid's calculation of what's at stake in this case: the Hughes, the Teledyne shares.

The government told us what it wanted to do to verify that Mr. McQuaid's calculation of what was at stake was right. It never mentioned the Teledyne shares. We spent a year and a half allowing them to do what they concluded they needed to do to verify Mr. McQuaid's calculation of what was at stake. They never once mentioned the Teledyne share. They said they were ready to talk. We went to Washington. We

made a proposal, and now, in July, which is 18 months after we gave them the documents because it took them that long to --

THE COURT: I know. Mr. Wiles, you know what, though? I understand --

MR. BIRD: The reason, if I could point out, is we pointed this out in our joint preliminary status report that we filed in October of 2005. At that point, we said the principal issue that divides the parties was the issue that relates to the allocation of pension assets to the transferred segments. That was our focus. It didn't really matter what the participation ratio was if we couldn't agree on the allocation of assets.

So the government's focus throughout the initial part of this process was on the allocation of assets. Then when Mr. Wiles came in with Mr. Browne, and we had the meeting in July; at that point, we had a better fix on the allocation of assets. But we still had made no progress on the government participation ratio, and it's a matter that makes a difference, both in this case, although the amount of swing might not be horrendously large here.

But one of the problems that the government faces in these cases is that we have to settle cases,

if we settle them, on a principal basis; that is, on the basis of here is what our position is, and it's very difficult for the government to accept an approach for one contractor that we're not prepared to accept for other contractors.

THE COURT: And what you don't want to -- is agree, without background information, that the allocation between -- I guess what you're telling me is the government's share is correct.

MR. BIRD: Exactly. Giving us aggregate data from the corporation as a whole and asking us to assume that that is equal to the share of each segment just is not a position that I could reasonably recommend --

THE COURT: Okay

MR. BIRD: -- to the people who would have to approve any settlement that they arrived at.

THE COURT: This is what I think we need to do. We do need to get that issue resolved within, it strikes me, you know, given the fact that we're approaching a Christmas holiday season, but we do need to get this thing resolved, it strikes me, by the end of April.

So what I would propose is this: Mr. Wiles and Mr. Bird, why don't you come up with a schedule

that allows you, Mr. Wiles, to file -- it sounds like, ultimately, Mr. Wiles, what you're going to need to do is file for summary judgment and find out whether or not there are, even on this issue, facts in dispute. Right?

So why don't we set up a schedule where you will endeavor to work on that issue but that sets us up with summary judgment due, you know, opening briefs due in six months?

MR. WILES: That would be fine, Your Honor.

THE COURT: All right?

MR. WILES: Okay. Do you want to give us the date to file, essentially, a joint report?

THE COURT: Yes. I've got to get a calendar that goes out to 2008. Do we have it? Okay.

So why don't you propose a schedule to me, on January 7th, that allows you to continue to do whatever -- exchange of information, you know, that is necessary, Mr. Bird, on the data and so forth, it strikes me, should be able to be done by the end of April, April 30th, and then, Mr. Wiles, why don't we have your summary judgment brief filed by June 2nd?

MR. WILES: Okay. That's fine, and we'll work on a schedule. We'll meet and confer between now and January 7th and provide you a schedule.

THE COURT: Right. That gets you whatever information needs to be exchanged, any depositions and experts and so forth.

MR. BIRD: Your Honor, one problem with that --

THE COURT: Yes.

MR. BIRD: The summary judgments that Mr. Wiles has been talking about have been legal issues. He was talking about something, for example, the surplus-transfer issue is an entirely --

THE COURT: We should have that resolved, I'm hoping.

MR. WILES: And, Your Honor, just so it's clear, our intention would be to move for a true summary judgment.

THE COURT: Yes. That's what I'm saying. I'm gathering that what you're suggesting is, is you think you can support this 10-percent allocation, or whatever the number is; that you have your numbers to support it, with the appropriate data and affidavits.

MR. WILES: Assuming Your Honor rules on the surplus-transfer issue --

THE COURT: Well, that may change it.

MR. WILES: If you rule in favor of the contractor on any theory, we think it's going to be

really easy to demonstrate that the government has gotten more value than whatever its cash payment would have been to the Teledyne share, even if you double Mr. McQuaid's calculation of what the Teledyne share is.

THE COURT: That issue, right.

MR. WILES: We think we can do that.

MR. BIRD: Your Honor, the issue that we're talking about for summary judgment; is that the government participation ratio?

THE COURT: I think that he can move for everything, if that's what he wants, but the issue that strikes me that's standing between you right now is this question of the government-participation issue.

MR. BIRD: The reason I ask, Your Honor, is there has been no discovery whatsoever conducted in this case. Your Honor referred, a minute ago, to exchange of depositions and things like that. We haven't had anything.

THE COURT: You haven't had anything?

MR. WILES: We're prepared to negotiate a schedule that gives them whatever they want. They can decide what they want, and we'll deal with it.

THE COURT: Let's, Mr. Bird, work on a

schedule. Okay? Recognize that this stuff is going on and on and on, and, ultimately, it's still striking me that the amount of the dispute here is something that is going to require, you know -- you're going to have to find what information, when you're going back in these cases, really you need. I understand that you need to be principled about all of this.

But with regard to the cases that we have, it doesn't sound like there is that much financially at issue that I think we should move this along. Okay? Let's see if we can get this thing resolved.

All right.

MR. WILES: Thank you very much, Your Honor.

THE COURT: Very good.

MR. BIRD: Thank you, Your Honor.

THE COURT: 'Bye-'bye.

(Whereupon, at 12:19 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//