UNITED STATES
COURT OF FEDERAL CLAIMS

DIRECTV GROUP, )
)
Plaintiff, )
)
v. ) Docket No. 04-1414C
)
UNITED STATES, )
)
Defendant. )

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on May 9, 2008.)

Pages: 1 through 52

Place: Washington, D.C.

Date: May 5, 2008

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIRECTV GROUP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 04-1414C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Monday,
May 5, 2008

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on May 9, 2008.)

APPEARANCES: (Via Telephone)

On Behalf of Plaintiff:

ALEXANDER WILES, Esquire
ADAM FLETCHER

On Behalf of Defendant:

C. COLEMAN BIRD, Esquire
MR. RABEEN
DAVID DELASONDROUS
U.S. Department of Justice

P R O C E E D I N G S

(2:09 p.m.)

THE COURT: Good afternoon, everyone.

MR. WILES: Good afternoon, Your Honor.

MR. BIRD: Good afternoon, Your Honor.

THE COURT: Okay. Mr. Wiles, you're there?

MR. WILES: I am, and Mr. Adam Fletcher of my office is on the phone with me.

THE COURT: Okey-doke. And is Mr. Brown with you too or no?

MR. WILES: No, he's not on.

THE COURT: Okay. All right. And, Mr. Bird, you're there with Mr. Rabeen?

MR. BIRD: Good afternoon, Your Honor, yes. And also I have taken the liberty of putting the call on the speaker phone, because David Delasondrous from my office is in my office with me.

THE COURT: Oh, well, good. Okay. Well, part of the problem I'm gathering we're having here is Mr. Wiles is trying to get to the bottom of the difference I guess between the government's position and his position. And if I sense this correctly, Mr. Wiles, you're getting a little bit frustrated that you can't seem to pin the government down as to what exactly or where exactly they disagree with your view

of the world.

MR. WILES: That would be one aspect.

THE COURT: All right. Tell me the other aspects when I'm going through this.

MR. WILES: Well, the requests for admission, there's three types of discovery requests for admission interrogatories, document requests.

THE COURT: Right.

MR. WILES: The document requests, it's fairly obvious why I'm frustrated. We asked for documents in late February, and the Court said they should respond on April 21 and get the client to make any documents available to us yet, and we have a June 2 discovery cutoff on two of the three issues in the case. So that's why I'm frustrated on that.

On the requests for admission, we plan to move for summary judgment on the segment accounting issue, which is the only issue dividing the parties besides the surplus transfer issue that you mentioned in GE.

THE COURT: Right.

MR. WILES: And so there are certain facts that we would like admitted. We think they are quite obvious, things like the fact that DirecTV did not allocate any costs, any pension costs after the

formation in 1994 of the DirecTV segment, of the consumer segment that's at issue in the case. And the government knows that and they've just declined to respond.

THE COURT: Well, this is what I'm trying to figure out when I looked at it. I saw your interrogatories and your production of documents. What I couldn't quite figure out is if you needed that because you were also seeking to have as your resolution of this matter in part the requests for admission being deemed admitted. And if the admissions are deemed admitted, tell me what more do you need.

MR. WILES: If the admissions are deemed admitted, I think there's a very strong argument for our summary judgment motion, because among the admissions are that we're in compliance with CAS. So I'm not sure. I would have to think about that a little bit more carefully, and I guess I would want to see the documents. That I'm sure I would want. I don't think I'd need answers to the interrogatories frankly.

THE COURT: Okay. I mean, I was trying to figure out where the real push points were. Okay.

Mr. Bird?

MR. BIRD: Yes, Your Honor.

THE COURT: I mean, I'm getting the sense, which sometimes happens, that the government hasn't quite figured out its position on this stuff.

Let's just work backwards for a moment. Let's start with the requests for admission. For the most part, you seem to be buying time, and what I'm trying to figure out is you asked for some documents from the other side, which the Plaintiff if I recall previously says you basically have everything because you did auditing. What exactly is going on here in terms of -- let's deal with the admissions first.

MR. BIRD: Your Honor, I'd be glad to, and I hope I can straighten out the record on what's going on here. The requests for admissions, I should point out one thing. We are going to respond today to five of the requests for admissions.

THE COURT: Okay.

MR. BIRD: Numbers 3 through 7.

THE COURT: Can you tell us what those are going to be?

MR. BIRD: Yes, I'd be glad to, Your Honor. We're going to admit them.

THE COURT: Okay. So you're going to admit 3?

MR. BIRD: Well, Your Honor, let me say this.

THE COURT: All right.

MR. BIRD: I believe that's what we will do.

THE COURT: All right.

MR. BIRD: I don't have a signed copy back.

THE COURT: Okay. All right. So 3 through 7. All right. So we have then 8, 9 --

MR. BIRD: Eight through 11 and 1 and 2.

THE COURT: All right, 8 through 12.

MR. WILES: Right, 8 through 12 and 1 and 2.

THE COURT: And 1 and 2, okay.

MR. BIRD: Yes, Your Honor, and if I could explain.

THE COURT: Yes. What's holding things up?

MR. BIRD: What's going on here, take No. 8 as a good example.

THE COURT: All right, I'll go to 8.

MR. BIRD: No. 8 asks us to admit that the DirecTV segment first came into existence as a segment for CAS 413 purposes in 1994.

THE COURT: Okay.

MR. BIRD: Now I have to say that that sounds like it could be right, but that's not a sufficient basis to respond to a request for admission

and make an admission that's going to be binding in this case unless it relieves us and allows to withdraw the admission.

What we're doing there is we're looking around for the CAS disclosure statement which DirecTV was required to file that discloses all of its accounting practices and then it changes its accounting practices. And the CAS disclosure statement, the amended CAS disclosure statement should we hope describe when it was that this segment came into existence.

THE COURT: Right. All right.

MR. BIRD: But we don't have that. They haven't found it, and we have asked for that in discovery from DirecTV.

THE COURT: Okay. All right.

MR. WILES: May I comment?

THE COURT: Yes, Mr. Wiles, that's fine.

MR. WILES: I'm happy to hear that requests 3 through 7 will be admitted. I think that's great. On No. 8, unless my memory is playing tricks on me, I believe that this statement is in one of the reports, one of the final decisions issued by the contracting officer, this very statement. And obviously he's the one who did the analysis. We did file the CAS

disclosure statement. So, if that's important to Mr. Bird, then, you know, he's had 50 days to find it.

MR. BIRD: That's my point, Your Honor.

THE COURT: Well, no, he said he can't find it.

MR. BIRD: We haven't found it. You asked for it in discovery.

THE COURT: But, Mr. Wiles, this should not be a hard question. Do you in fact have that? I mean, under the CAS, I mean, all of these segment things are all done with various disclosure statements. Do you not have that?

MR. WILES: I believe we do.

MR. FLETCHER: Your Honor, this is Adam Fletcher from DirecTV.

THE COURT: Yes.

MR. FLETCHER: I believe that we have the disclosure statements. I'd be hesitant to say with certainty that we have any one in particular. Is he saying that the 1994 disclosure statement is the most relevant one?

THE COURT: Well, because he's saying that you're admitting that that's when it first come into existence as a segment for CAS 413.

MR. FLETCHER: We're in the process of

gathering and producing the documents in response to their requests for production.

THE COURT: Okay.

MR. FLETCHER: And I know we found disclosure statements, but I just can't say for certain right now whether we found that particular year.

THE COURT: All right. Yes?

MR. WILES: And just one thing so it's clear, we're not late in our response.

THE COURT: I know.

MR. WILES: They didn't serve anything until April.

THE COURT: Until April, yes, I know. I understand. But it sort of points out what Mr. Bird is saying, that it's difficult for him to admit things that they can't verify, okay? And so I know, Mr. Wiles, you were complaining that they haven't admitted things as if somehow he's, you know, withholding.

I'm trying to figure out if they've in fact asked you for documents and we're a month away from the close of discovery?

MR. WILES: Correct.

THE COURT: Then I'm not quite sure why, you know, doesn't it strike you on these admissions -- I'm

glad to hear actually 3 through 7 have been done, but is it not a bit premature?

MR. WILES: Well, I think, you know, it's their responsibility under the rules to respond to them and to on a case-by-case basis describe the reasonable search that they've done.

THE COURT: Yes. Okay.

MR. WILES: If they can't respond, then, you know, the boilerplate responses just don't apply. I can point the Court to the cases for that proposition.

THE COURT: No, no, I agree. I mean, some of it, I agree with you, Mr. Bird, it is a bit boilerplate.

MR. BIRD: Your Honor, could I be heard on the point whether those require the government to describe in detail for either reasonable investigations we have conducted before we state in the precise language of the rules that we have made such an inquiry and based upon the results of that inquiry are not able truthfully to admit or deny? I don't think that's what the rule requires.

I think the cases that the Plaintiff is relying on for that proposition are wildly misguided. The authorities are sound, but they don't apply in this case. I haven't found any case that says you

have to put that in your Rule 36(a) response, and that's the premise of the entire motion.

And I should also say, Your Honor, it's not just Request For Admission No. 8. There are other requests for admission that are equally difficult. For example, Requests No. 1 and 9 require us to admit that DirecTV never allocated pension costs to any government contract after 1992. That's Request No. 1. And Request No. 9, that DirecTV never allocated pension costs to any government contract after the creation of the DirecTV segment. Of course, we're not sure when that date was.

But that alone requires us to look back over 16 years, and it's not like there was just a single file in which you can go and see, well, did we get a bill for pension costs or didn't we for this year. I understand that pension cost is an indirect cost that's included in an indirect cost pool, and to see if pension cost was ever allocated, you have to find the incurred cost submission for each year during the covered period. In this case, that would be 16 years.

THE COURT: Well, hold on. Let me just back up. I thought DirecTV was no longer doing this government work. So tell me, Mr. Wiles, after 1994, what government work was DirecTV doing?

MR. WILES: After 1994, DirecTV did quite a bit. But through the process of the two sales that are at issue in this case, it effectively divested itself of all government --

THE COURT: I'm sorry. That's what I meant. I thought they got out of the government.

MR. WILES: Correct, and that was through two different transactions, one in 1997 and one in 2000.

THE COURT: Oh, okay.

MR. WILES: You know, there might be some --

THE COURT: All right. So we have a few years, but we're not looking at 16 years.

MR. WILES: Right. And the point is that the government well knows, this is again in all of the reports, their final decision and such that are the basis of the case, that DirecTV's pension plans were fully funded. The last contribution was in the middle of 1992. There were no further contributions to the plan, no charges to the government from 1992 until the time when we got out of the business. So that's a major part of our thinking as to why it is that the government's (inaudible) position is wrong.

THE COURT: Tell me, when was the Raytheon sale?

MR. WILES: The end of 1997.
THE COURT: And then Boeing?
MR. WILES: October of 2000.
THE COURT: Okay, all right.
MR. BIRD: Your Honor, the problem is that we can't take these matters on faith.
THE COURT: No, I understand.
MR. BIRD: He may very well believe that they did sell all of their government work and that they didn't allocate any pension costs to the government after 1992. But we have to confirm that in order to respond responsively to these requests for admission.
THE COURT: Right, but it's an eight-year period maybe, I mean a nine-year period. I mean, at most, it's going out to 2000.
MR. BIRD: Your Honor, that isn't the period covered by the request. The period covered by the request is to date. And how do we know what they've bought in the meanwhile? We have to answer the requests for admission that they framed, and what they frame is for 16 years.
THE COURT: All right.
MR. WILES: Your Honor, the point here of our motion is Mr. Bird has had this. He's known what

he had to do for 50 days, and he's chosen basically not to do anything. He didn't respond whether or not he has an obligation to put the scope of his inquiry in his response. He certainly has an obligation if he wants to avoid having the addition of things deemed admitted to explain it now.

You know, everything that occurred in the meet-and-confer suggested that the government lawyers or the Department of Justice lawyers at least have not even gotten and reviewed any documents to evaluate this issue.

MR. BIRD: Your Honor, that's inaccurate. Again, I don't think Mr. Wiles knows what we have done to do this document production. We've gone out to 11 separate offices. We're still getting returns from these offices with respect to the document production. I'm not the only Department of Justice lawyer working on this case, thank goodness.

THE COURT: Okay. all right. So just to get us back on focus for a moment, your plan with regard to the requests for admissions, you intend to admit several of them, 3 through 7, you're telling me.

With regard to 1 and 2 and with regard to 8 through 12, Mr. Bird, do you have more detailed responses as to what's going on, or are you waiting to

get the documents that you requested for them and that you're apparently looking for on their behalf?

MR. BIRD: Your Honor, the answer to that is both. We do have some responses, and I thought that from one particular office that arrived I believe late last week, it suggests that No. 1 is not the case. I'm sorry, No. 2 is not the case.

THE COURT: Yes.

MR. BIRD: And No. 1 may not be the case either. But again, when we get a response from an office like that, we can't just say, oh, denied based on that. We have to confirm and make sure. That's part of the process. We're not sitting around like the Maytag repairman trying to avoid doing any work.

THE COURT: I understand. All right. With regard to the interrogatories, where are you?

MR. BIRD: Your Honor, with respect to the interrogatories, I should emphasize, Your Honor, that we told Mr. Wiles last week before he filed his motion that we were going to supplement the Requests For Admissions 3 through 7 and Interrogatory 1 in part 2 and 6 whether or not he filed his motion to compel. We urged him not file it, but we told him that we were going to provide these responses.

And we've talked about Requests For

Admission 3 through 7. And in terms of Interrogatory 1, 2, 6, again, we believe that we will have responded by the end of the day to 1, 2 and 6.

Now Interrogatory No. 3, there's the same question as the request for admission that we looked at before. Interrogatory No. 3 asked the government to state the amount of pension funds --

THE COURT: I see.

MR. BIRD: -- allocated to government contracts for the period from 1987 to the year 2000. That's another 16-year period. We're being careful, and our answer was I believe entirely proper.

THE COURT: Right.

MR. BIRD: We're working on it. We will supplement it. It's not like we're not going to provide this information. It's just our position has been where we have the basis to answer, we will answer; if we don't say that we don't have the basis, we'll supplement later.

THE COURT: Yes.

MR. BIRD: We're supplementing as to 1, 2 and 6. I should also add, Your Honor, that we have agreed to supplement Interrogatories No. 5 and 7. Although we haven't said when we would do that, we hope to do that by the end of this week.

THE COURT: Okay.

MR. BIRD: And this was an agreement that we advised Mr. Wiles of last Thursday, May 1.

THE COURT: Okay.

MR. BIRD: And that's where we are I believe on the interrogatories.

THE COURT: All right. And on the document production I'm gathering, what are you doing? You're looking?

MR. BIRD: Your Honor, I think I have some good news there at least for the Court if not for Mr. Wiles.

THE COURT: Yes.

MR. BIRD: We plan to produce tomorrow, assuming we can get agreement on a protective order, we plan to produce approximately 6,700 pages of documents in the form of scanned images out of here tomorrow.

THE COURT: Okay.

MR. BIRD: And that's approximately 600 separate documents. We have documents on their way to us which when they arrive will have to be reviewed for responsiveness and privilege. We are aware at this point of at least two boxes of documents and possibly considerably more. I'm just not sure about that. And

when they come in, we'll get them imaged. We'll review them for responsiveness and privilege and get them out the door.

At this point, as I mentioned, we've gone to 11 different offices and are working with responsible document people at those offices in order to make sure that we produce the documents that we have agreed to produce that are responsive. So that's where we are on the documents.

THE COURT: All right. Well, Mr. Wiles, given the fact that you know discovery is still ongoing, it sounds like Mr. Bird is going to be sending you a bunch of stuff.

MR. WILES: It sounds like he's going to be sending me a bunch of stuff, but it doesn't sound like we're going to get a complete production anywhere near the time we need to do the depositions that we've scheduled for late May. I mean, you know, basically what I've heard him say is I've got 600 documents in hand that I can produce.

THE COURT: Is it 600 or 6,000?

MR. WILES: Well, he said 6,700 pages.

THE COURT: Yes.

MR. WILES: Six hundred documents.

MR. BIRD: Actually, Your Honor, it's 1,600

documents.

THE COURT: Okay.

MR. WILES: Oh, 1,600? Sorry. I misheard. Okay. And then there's a lot more on the way. I think we need an order that requires him to produce the documents by a specific date that's not too long into the future.

THE COURT: Okay.

MR. WILES: Otherwise, I mean, how are we supposed to evaluate the documents and plan the depositions?

With respect to the interrogatory answers, I mean, Interrogatory No. 3 should be answered. It says tell us the total amount of pension funds. The government is obligated to figure that out from the documents that they have in their possession and to answer it. We can say, well, you know, here we are. We've had this for 50 days and we haven't answered yet. We asked for a six-week extension. We only got a three-week extension, but we still chose not --

THE COURT: Well, Mr. Wiles, let's not get too carried away. You can't seem to find the document you're sure as to when they declared themselves a segment in 1994. I mean, we're dealing with thousands of pieces of paper on multi-, multi-million dollar

contracts with lots of things going on. And I know we put it on an expedited schedule because you were very excited and anxious to get it moving like that. And you're the Plaintiff and you have that right. Nonetheless, when that happens, it means that you're assuming the responsibility of the crunch.

Nonetheless, Mr. Bird, it does strike me in order to make some of these depositions obviously meaningful, you need to give your people a sense of urgency. And your sense of it is today is May 5. In the next two weeks, can't you get everything that you possibly can to Mr. Wiles?

MR. BIRD: Well, Your Honor, we will endeavor to make that, but I have to say, Your Honor, we've already given them a sense of urgency that we need to get this done and we need to get it in our door and out the door to Plaintiff. We can make a maximum effort, but here is the problem. And if I could for a moment, Your Honor, address the subject of deadlines?

I think there is a serious risk that the Plaintiff's insistence upon this deadline is going to interfere with the Court's arriving at a fair and just result. The deadlines are important, but we believe the Court would think that fairness is even more

important. And to me, the orderly way to do this is to complete the document production by both sides, have both sides have an opportunity to look at the documents and then have depositions.

And that might require a relatively brief extension of the June 2 deadline. It's not something we are prepared to ask for at this point because my experience is that Courts want to make sure that we have gone all out and done the best we can do, and we are still working on it.

THE COURT: Well, you know, I agree with you that at some point that ultimately justice is a controlling concept. Nonetheless, that's why I was trying to get you focused on the admissions more than anything else. It strikes me Mr. Wiles has identified the key admissions that they think are necessary to move for summary judgment on this issue. It strikes me that the documents that are targeted to those admissions, Mr. Wiles, should be what you are most interested in.

Having a calculation of things between 87 and 2,000, I'm not sure. I didn't see that repeated, for example, in your admissions. And so some of this stuff I was a little bit confused about as to whether or not you were being a little bit "piling on" when in

fact you had some pretty limited admissions that I thought were directing your summary judgment.

MR. WILES: Well, certainly the Interrogatory No. 3 covers a slightly broader period than the one we contend is relevant. But I don't think you've heard Mr. Bird concede that the timeframe from 1994 is the first timeframe in which things are relevant. So that's why we asked for a somewhat earlier timeframe than 1994, because we think that the government may take positions that, you know, 1992 is relevant or something. I don't know exactly what position they're going to take.

Some of the discovery they sent to us would suggest that they think that the plan amendments in 1990 have some significance to this case. We don't think so. Some of the discovery they sent to us would suggest that they think that a transaction that DirecTV did in 1992 has some relevance to this case.

THE COURT: I see.

MR. WILES: But that's not in the final decisions, and we don't think so. You know, Mr. Bird and I actually discussed the 1992 transaction, and he certainly indicated that yes, he thought it was relevant, so he certainly wasn't willing to rule it out.

So that's the reason why we have an Interrogatory No. 3 a few years going back from 1994. But from our standpoint, we think what's really relevant here is exactly what Your Honor said, which is the segment was formed in 1994.

Were there any contributions or any costs charged to the government from the time the segment was formed until DirecTV got out of the business and can the government prove that the segment had sufficiently different actuarial attributes to require segment accounting in the first place even if you assume that there was a material effect on pension costs, which we think there clearly wasn't. There was no cost charged. So those are in our view the key issue of accounting.

THE COURT: Yes.

MR. WILES: And the Teledyne share materials, we haven't really targeted much of the Teledyne share issue because in that one, we've done our job. We've done our evaluation. We've produced an expert report subject. The government, by the way, let the expert report deadline come and go and served no expert report. So there won't be a government expert on either of these two subjects.

You know, Teledyne's share, we haven't

really focused much on Teledyne's share.

THE COURT: Okay.

MR. BIRD: Your Honor, if I could address that last point, there will be a government expert. The government's expert is awaiting the results of the Plaintiff's document production in order to be in a position to express an opinion on the segment asset allocation issue, because that's a particularly complicated issue, and it arises, the duty to do segment accounting arises when there are differences between the segment in question and the average of the other segments in terms of key variables like level of benefits, eligibility for benefits, age distribution, things of that sort. Those facts are almost uniquely in DirecTV's hands.

THE COURT: Well, back up for a second. Mr. Wiles, when was the expert deadline?

MR. WILES: March 24.

THE COURT: Yes. And, Mr. Bird, where were you?

MR. BIRD: Your Honor, the Court --

THE COURT: I actually don't have that order in front of me, so I apologize.

MR. WILES: The expert deadline is triggered by the rules.

THE COURT: By the rules, right.

MR. WILES: So it's 70 days I think before June 2 if my memory is right by the rules.

THE COURT: Mr. Bird?

MR. BIRD: Your Honor, that's a disclosure obligation, and I was anticipating that the Court would direct an expert report exchange.

THE COURT: I don't have the order in front of me. What did the order on June 2 say? That's what I don't have.

MR. WILES: The order for June 2 is simply the discovery cutoff under the rules.

THE COURT: I didn't distinguish between fact and expert? That's what I don't remember.

MR. WILES: Well, what you said was that fact and expert discovery had to close on I believe the segment accounting issue by June 2.

THE COURT: That's what I wanted to know, did I use the word "expert". That's what I didn't have in front of me.

MR. BIRD: But that order did not specify any deadline for the exchange of expert reports.

THE COURT: All right. But under our rules and under the disclosure requirements, you have to disclose the expert when? Is it 70 days? I'm trying

to find it.

MR. WILES: That's what I remember. I don't have the rule right in front of me. We calculated March 24 in my recollection, and we calculated it based on the 70-day rule.

MR. BIRD: Your Honor, I would request that we have an opportunity to address this issue.

THE COURT: Okay. Hold on.

MR. BIRD: Because this is obviously a matter -- I'm sorry.

THE COURT: All right. It's always something. Mr. Bird, I'm actually trying to find -- Mr. Wiles, take a moment and find the rule for me.

MR. WILES: All right. It's Rule 26(a)(2)(C), Your Honor.

THE COURT: Say that again.

MR. WILES: It's 26 --

THE COURT: (a), I'm with you.

MR. WILES: I'm sorry, (a)(2)(C).

THE COURT: (a)(2)(C). Seventy days before the schedule closes, all right.

MR. BIRD: The problem, Your Honor, is --

THE COURT: What's the problem, Mr. Bird?

MR. BIRD: We have engaged an expert.

THE COURT: Who's your expert?

MR. BIRD: Mr. England, Your Honor.

THE COURT: Okay.

MR. BIRD: With whom the Court is familiar, and he has advised us that in order to express an opinion, he needs the information that we don't have, and that's what we asked for in discovery. We asked very specific information relating to differences between, and by the way, I should point out, the segment that the Plaintiff asked about in these first discovery requests is not the segment that's at issue. They asked about the commercial segment, the segment that does the satellite television broadcast service for residences.

THE COURT: Yes.

MR. BIRD: That's not the segment that's at issue. The segments that are at issue are the two segments --

THE COURT: That were sold.

MR. BIRD: And they didn't ask about those. And we're not hiding the ball here. I don't want to be accused of that, but that's important. What matters is the differences between the segments that were sold and the average for the other segments of the business at the time that these differences arose. That's what triggers the obligation to do segment

accounting.

We have never contended that they were required to do separate accounting or segment accounting for the DirecTV commercial segment, because if it's a truly commercial segment, we don't have any jurisdiction anyway. We can't tell them how to account for that. All we care about is the accounting for the segment that's going to be charging the government pension costs.

And our expert tells us that the kinds of things that we need to look at are things that are almost uniquely within the possession of the Plaintiff: the level of benefits, the age distribution; whether different actuarial assumptions were appropriate for the segment versus the average of all the other segments on such issues as retirement age, salary scale, terminations, or if there is a merger of pension plans, were there differences in how much each plan was funded or was there a material termination gain or loss attributable to this segment.

This is stuff that DirecTV knows, and without discovery, this is stuff that the government does not know, at least certainly does not know all the facts. And that's why we need this discovery and that's why we would need an opportunity to review the

results of the discovery in order to submit an expert witness report.

THE COURT: Do you have their expert witness report?

MR. BIRD: We do, Your Honor.

THE COURT: When did you get it, Mr. Bird?

MR. WILES: March 24.

MR. BIRD: I have no reason to dispute that.

THE COURT: Okay.

MR. BIRD: It was sometime ago, Your Honor. That report went far beyond the asset allocation issue. That report was a report on the segment closing calculation issues that are not before the Court. That report also in my recollection did not address or question whether the factors of 41350(c)(5)(ii), which is the relevant CAS provision, whether those factors were present. That's what determines whether or not separate segment accounting was required.

THE COURT: Mr. Bird, let me just ask you, as a practical matter, have there not been DCAA audits on all of this?

MR. BIRD: There were DCAA audits, Your Honor, in the year. There were audits of the segment closing calculation, although initially when the final

decision was issued, they had to issue the decision without a segment closing calculation because DirecTV refused to supply it. It was audited, and there were audit reports that said we think you should be doing segment accounting. And that was I believe in 2002, 2003, something like that.

MR. WILES: Your Honor, yes, there were audits. There were constantly audits. The only final decisions of noncompliance had to do with the segment closing, the sales of the transaction.

THE COURT: But in terms of the prior sort of segment creation and allocations and so forth, Mr. Wiles, were there audits that took place historically throughout that period?

MR. WILES: I think the answer is yes. I know there was a lot of discussion in the documents that we looked at concerning, you know, some issues.

Now Mr. Bird's summary of the facts is really ironic, because the last of the final decisions makes absolutely clear that the basis for the alleged noncompliance is in fact the failure to segment account for the consumer segments that Mr. Bird just conceded he wouldn't have jurisdiction over.

So the segments that Mr. Bird is now talking about, it's almost tautological that neither one could

have been different from the average of the company, because each of the sold segments at the time it was sold comprised 75 percent of the company. So it's almost tautological.

And there was never a suggestion in any of these final decisions that DirecTV should have segment accounted for those segments separately on account of differences between those segments and the company as a whole for obvious reasons.

So, you know, what happens in this case is that each time we have a conference, each time we have a meeting with Mr. Bird which doesn't involve the Court, the government's theory moves, it changes direction to suit the particular argument of the day.

The fact of the matter is you listed the stay on this case in November. The government was free to ask for whatever discovery it wanted to ask for on December 1. It didn't do so. Then in January, we had another conference where you made clear that the discovery cutoff was June 2, so the government was free to ask for any discovery it wanted to, and the government is much more familiar with the rules of this Court than I am, so they should have known that the 70-day rule would apply.

They could have asked for discovery in

December, in January, and they would have had the discovery and they could have given it to Mr. England and done the report. But the problem is that their theory just keeps changing. The theory that I just heard today I would love to be the theory on which we litigate the case because I can't possibly lose on that. My client can't possibly lose on that theory, the 75 percent of the company each time. So how could 75 percent be different from the average?

THE COURT: Okay. Yes?

MR. BIRD: That's what we're trying to find out in discovery, Your Honor, and that's the problem. They know the facts and we don't.

THE COURT: Well, Mr. Bird, that's not exactly true. In these relationships, I mean, it's not like they haven't been audited and so forth. While I understand that the government, you know, should be and the public is entitled to whatever its appropriate share of these proceeds are, leaving aside the surplus transfer issue for the moment, what I'm trying to make sure is I wanted to confirm how clear I was in my order.

Mr. Bird, we've got a little bit of a problem here in terms of abiding by these deadlines. Mr. Wiles is right. It wasn't as if you guys weren't

trying to work this out and that everybody sort of knew back in January what we were going for. Under the circumstances, what I need you to do is Mr. Wiles is a bit concerned about setting a deadline to ensure that at least two weeks I would imagine, Mr. Wiles, before -- have depositions been scheduled, Mr. Wiles?

MR. WILES: We scheduled them for May 22, or maybe May 20 was the first date. But we told the government that, you know, we were willing to move it a week if we need to.

THE COURT: All right.

MR. BIRD: Your Honor, we are exploring the availability of witnesses. There are two 30(b)(1) depositions and one 30(b)(6) deposition with a very extensive 30(b)(6) schedule that we are trying to work out the details with which may lead to a motion for a protective order on the government's part.

THE COURT: Okay. All right. Well, what we're going to need to do is make sure that you get the documents obviously from the requests for admission, which I would recommend you look at carefully. I mean, it strikes me there should not be this level of difference between you. That's why I was sort of focused on the admissions, Mr. Bird. It may be that you really want your folks to really be

looking at that carefully, I mean, as to really whether there are these major differences.

We can all get all the information we need in the world, but to the extent that Mr. Wiles is focused on what he has asked to be admitted and you're able to do as much of that as possible, I'm hoping that that would minimize the amount of sort of potential expert disagreement that may exist.

All right. Mr. Bird, I will set a deadline to get the interrogatories and the documents done. Let's set that for May 22, okay?

MR. BIRD: Your Honor, we of course will abide by the request.

THE COURT: Yes. Mr. Bird, if there's some compelling reason on the expert business, you'd better think about some appropriate motion on there. I mean, I wasn't sure what I had said, but I have it in front of me. Expert discovery was actually set in black and white. It wasn't ambiguous in any way, and you do know these rules. But you also need to look at, you know, the admissions being made and whether or not there's a reason for there to be an expert on your side. I mean, I don't mind somebody advising you.

But I'm sympathetic with Mr. Wiles's concern about changing theories in this case. I mean, you

know, the real question is, did they adequately account for the government pension contributions? And there should be a relatively straightforward answer to that. This part should not be the hard part.

MR. BIRD: Your Honor, the problem is that the government has a burden that DirecTV does not. DirecTV, all they have to do is say we don't think we're required to do segment accounting. We have a legal basis for that, which is the claim that because no pension cost was allegedly allocated to government contracts, the government had no basis to require segment accounting even though the government's surplus if segment accounting were required was being used up over the years to pay for the benefits of people who didn't work on government contracts.

So, for DirecTV, that's comparatively easy. For us, we have to say, oh, we think that segment accounting was required and here's the basis for it and the particular facts relating to these plans. And that's something that, as I mentioned, our information on is fragmentary. That's why we need it.

I'm not trying to hide the ball, and I would respectfully suggest that we're not changing position here. Our position as far back as the status report we filed back in January is that we think discovery

will show that segment accounting was required. We're not sure what discovery will show.

THE COURT: And you thought segment accounting was required, though, as of when, which seems to be the problem? Back when? They started it in '94.

MR. BIRD: Well, no, they didn't, Your Honor. They've never done segment accounting.

THE COURT: I'm sorry. I thought they created a 413 segment in '94.

MR. WILES: We did for --

THE COURT: Oh, for one?

MR. WILES: For the consumer segment.

THE COURT: All right. Maybe I'm misunderstanding. Does that then not mean that your government contracting was separately accounted for after that date?

MR. WILES: No, we use composite accounting. But we did create a segment, but we continued to use composite accounting.

THE COURT: All right. So you created a segment for your consumer division.

MR. WILES: Correct.

THE COURT: And when was that consumer division created? Because I thought 75 percent of the

business you were telling me was government contract business.

MR. WILES: Correct. So, in fact, let me phrase it slightly differently.

THE COURT: Okay.

MR. WILES: The business we all know today to be DirecTV was a tiny little business in 1994, but it had a future, and that's why DirecTV chose to create a commercial segment for the business at that point. By 1997, when the first of these two transactions took place, well over 75 percent of the company's business was government contract business, 75 percent of it. What we call today the defense segment, which is only part of the government contracting segment, was sold in 1997 --

THE COURT: I see, okay.

MR. WILES: -- leaving behind a satellite business as well as this consumer business. The satellite business of course was predominantly the government contracting business. That business was 75 percent of what was left behind after the "defense segment" was sold to Raytheon. And then that satellite segment in turn was sold in 2000.

THE COURT: And that's the Boeing transaction, correct?

MR. WILES: Correct.

THE COURT: Okay.

MR. BIRD: I think, Your Honor, that what this has made clear is that DirecTV has never used segment accounting for pension costs, and the question is under the CAS whether they were required to do so at some point.

THE COURT: No, I know, Mr. Bird. I agree with you. Part of the problem, though, is that there had to have been audits going on along the way in which somebody, not you but somebody from the Defense Contract Audit Agency had to be saying either what you're doing is okay or you need to create a segment.

I mean, what I'm worried about, are we going to be litigating some CAS violation dating back from 1987, and if so, I'm not sure what rules apply to that.

MR. WILES: Yes, and, Your Honor, our position as to what we're litigating is the final decisions of the contracting officer.

THE COURT: Right.

MR. WILES: And there's nothing on this in the final decision of the contracting officer. What the final decision of the contracting officer talks about, the one that's clear -- the first one on

Raytheon is very unclear because it relied on the wrong CAS. It relied on new CAS and all the Court decisions coming out.

THE COURT: Right.

MR. WILES: So then the last final decision, it's actually pretty clear. It's exactly what Mr. Bird says is not at issue in this case and concedes that he wouldn't have jurisdiction to complain about.

So, you know, we can't be sitting here wondering what this case is about. We think the case is about the final decisions. The last one is pretty clear in what it articulates, and we believe we are entitled to summary judgment, that what is articulated in that final decision is not proper.

MR. BIRD: But, Your Honor, getting back to I think the point that the Court was making, which is that this must have come up if, as DirecTV claimed, no pension cost was allocated --

THE COURT: After '92 I got.

MR. BIRD: -- after 1992, then there would be no occasion for the government to review as part of a review of an incurred cost submission a cost item that wasn't included.

Now the other point is that even if they had reviewed it, the answer that they would have been met

with had they raised the question is we're not charging you pension cost anyway. You're talking about how many angels could dance on the head of a pin. It doesn't make any difference because we're not billing you any pension costs.

THE COURT: No, but what I heard you suggesting is that they should have done this 20 years earlier, because by virtue of not having the segment, a government business segment created of some sort that somehow your contention I thought was that the government pension costs were subsidizing the nongovernment costs and that somehow you wanted to recoup that in some way.

MR. BIRD: Well, it was more, Your Honor, that if as Plaintiff alleges that no pension costs were being charged, the question was not whether the government pension costs were subsidizing the pension costs that were being allocated to the commercial work but that the surplus, that is, the surplus that was --

THE COURT: I'm sorry, was being absorbed? I apologize, I did hear you. I apologize. I misspoke.

MR. BIRD: Then that would be a basis to require segmentation. And the reason we're raising this issue is that the segment closing provision, CAS

41350(c)(12), specifically refers that you have to determine what the assets were of the segment at the time of the segment closing. And if there was an improper failure to segment, then that should not be an affair for a party to file under the CAS.

THE COURT: All right. Well, Mr. Wiles, you now kind of have a sense of what the government's concern is, or maybe you knew that previously.

All right. I appreciate it, Mr. Bird. We're going to set some deadlines. You're going to get the documents and your answers to the interrogatories by May 22. I think that if at some point what you're going to want is an expert response, you and Mr. Wiles probably need to chat about that and start scheduling some depositions. This should not be the most complicated issue in the world we're dealing with, and I can appreciate the fact that there are issues.

Mr. Wiles, how much money is at issue right now in the Teledyne segment?

MR. WILES: There are three possible outcomes to the case. One would be if the Court rules on the surplus transfer issue in a way that --

THE COURT: That you get credit for it.

MR. WILES: -- that gives us a credit, in

almost any calculation, we would owe nothing. The second possible outcome is that the Court says that the surplus transfer issue, you know, there's no credit associated with that but rules in our favor that no segment accounting was required, in which case we would owe something like $300,000, and I'm not counting interest in that number.

THE COURT: Okay.

MR. WILES: And then the third possible outcome is that the Court rules against us on both the surplus transfer and segment accounting issue, and our expert's estimate, which we supplied to the government as part of the settlement discussions, was that that would result in us owing about $1.6 million.

THE COURT: Okay.

MR. WILES: The reports that the final decisions have far larger numbers, which is part of the reason why my client, a public company, is anxious to get this resolved, since right now the government's actuaries and our actuaries both know that the outcome if we lose is a very small number compared to what's in the reports. And that's I think a significant part of my client's frustration, plus the fact that, you know, once you realize what the case is about in terms of dollars, there has to be some proportionality to

the way the case is litigated.

THE COURT: Yes, as to how much is at stake, right. Okay.

MR. BIRD: Your Honor, to the extent that there is a disparity between the amount requested in the final decision and the amount that the government would say is due after discovery has been completed, that's really a self-inflicted wound.

The reason is that the government was forced to estimate, to make estimates which were called I believe in the language of the final decision rough orders of magnitude because DirecTV simply refused to provide the data. And it's a little bit much for DirecTV to say how frustrated they are, et cetera, et cetera, when the reason that we're in this fix is because they have resisted the administrative process every chance they got.

THE COURT: All right, but now the information that you owe to Mr. Bird, let's flip it around, Mr. Wiles, when are you getting that to him?

MR. WILES: Well, I would like to have whatever day you give him.

THE COURT: Okay.

MR. WILES: Was it May 22?

THE COURT: That's what it will be.

MR. WILES: I would like to have the documents and interrogatories.

MR. BIRD: Your Honor, if I may, Mr. Wiles is ready. He doesn't need the time. He said last week that he would be ready to produce on May 7.

THE COURT: Well, Mr. Wiles, do you have it?

MR. WILES: We could clearly start the production.

THE COURT: Start the production.

MR. WILES: There's no question.

THE COURT: Right.

MR. WILES: But, you know, what's going on here is the government is profiting by its own failure, and I don't think that's appropriate.

THE COURT: Well, part of this is we're all profiting. Part of it is is I'm hoping when all this information is exchanged that we will sit down and figure out, leaving aside the surplus transfer issue, what exactly are the big issues between you and Mr. Bird, whether or not this is the appropriate vehicle to get some of these principles you want resolved resolved, okay? I mean, that's part of what we have to figure out here.

MR. WILES: Yes. And, Your Honor, just so I'm clear, and I'm sort of making a statement that I

made in both of the last two status conferences, what we want to do when discovery ends is move for summary judgment.

THE COURT: Yes, I understand.

MR. WILES: So if the surplus transfers -- I'm not as familiar with the GE case as Mr. Bird is, so I don't know what the timing is.

THE COURT: The timing of that actually for some practical reasons has been pushed back a bit.

MR. WILES: Right.

THE COURT: I mean, part of it is I have a law clerk that was on that case that just gave birth three weeks ago.

MR. WILES: Well, congratulations.

THE COURT: Congratulations to her. That's not so great congratulations to me.

(Laughter.)

MR. WILES: Okay.

THE COURT: When she gets back, that is her first priority, yes.

MR. WILES: So, in any event, our goal is,when we get to the right point, when we get to the end of discovery, move for summary judgment, and this is one of the reasons why our expert report said what it did, that we would move for summary judgment, that

we owe $300,000 subject to the resolution of the surplus transfer issue, which would reduce the $300,000 to zero.

THE COURT: I understand. Right.

MR. WILES: That is what we've been trying to do since November.

THE COURT: I understand, yes. Mr. Bird?

MR. BIRD: That's precisely the problem. Even though back in January the Court heard extended argument from both sides and decided we're going to look at two issues and only two issues, we're going to put the surplus transfer issue to one side, we're going to look at two narrow issues, the segment allocation issue and the Teledyne share issue, Plaintiff's view is that that meant that the government had to complete discovery on every issue in the case except the surplus transfer issue. We don't think that's what the Court ordered.

THE COURT: No, but, Mr. Bird, let's keep this in mind of what we're talking about. I mean, if in fact what we're talking about is a Teledyne share that's somewhere between $300,000 and $1 million and we're looking at the various principles that are at stake here, because, as you know, these cases create principles for other cases, let's just think seriously

about what are the principles that are really at stake.

If the concern you have is when do companies have to do segment accounting and so forth, I'm not sure whether or not as part of the CAS 413 segment closing, which suggests that if things have not been segmentized that, you know, that's when you can actually do it, and I know there's other parts of 413 that actually explain when you should have been doing a segment, I'm not sure how all those things work together when there's been audits and perhaps people haven't said, you know, you're not doing this properly.

So, I mean, let's just keep the principles in mind of what we're trying to achieve. Ultimately, some of these cases present some very serious issues and sort of, you know, rules that are sort of collectively creating under my signature as a judgment as to how to proceed in these matters and they all build on each other to some degree. But, I mean, I don't want to make a mountain out of a mole hill if in fact, you know, we're just in the weeds here fighting over issues, that the way this was administered was maybe not the most proper way to do it as opposed to the principles involved.

And I'm getting a little bit concerned that we're in the weeds as opposed to what are the principles and whether or not generally speaking this was allocated properly, because remember, as from here on out, we've got, you know, the 95 rules of the governing authority. So I just want you to bear that in mind, okay?

MR. BIRD: I will bear that in mind.

MR. WILES: This is an issue, one of the things they talk about for mootness, capable of repetition but evading review.

THE COURT: I know sometimes they are, but we have to think about the fact that how many of these do we have and is this the right vehicle for that or is there something that after you get the information you guys can reach a resolution on? Because some of what I'm hearing is going sort of back in history not on principles of the CAS 413 and segment closing but how things should have been accounted for, you know, 15 years earlier.

And that I'm a little bit worried about, you know, how we'll be opening that in a segment closing and what authority there is to do that and whether or not that that's going to send chills through the entire system. So, I mean, those kinds of things we

need to think about.

All right. In the meantime, let's get the documents done. Let's get those admissions out. I would ask you, you know, to focus on those in particular, Mr. Bird, and everybody will have a document deadline by the 22nd.

As for now, I am not changing the close of expert discovery. Mr. Bird, you've got to think about working with Mr. Wiles on some arrangement if you've got an expert you are thinking about. Okay. Take care, everyone.

MR. WILES: So the deadline is May 22 basically for everything?

THE COURT: Everything other than depositions.

MR. WILES: Okay. Thank you, Your Honor.

MR. BIRD: Even though Mr. Wiles is ready to produce tomorrow?

THE COURT: Mr. Wiles said he would begin producing.

MR. BIRD: He said last week they would produce. What they're going to do is they're going to put the documents up on a website, which is a kind of production we haven't had before. But he said as I understood it that the production would be complete

and all we had to do was get a password and get on the website.

THE COURT: Mr. Wiles, can you do that?

MR. WILES: I don't think we're going to have everything on it. I mean, we'll have everything on it by May 22. I don't think it's fair to impose on our client an obligation that's different from the one to be imposed on the government.

THE COURT: Well, no, the government is producing documents to you as they come in. I'm not going to tolerate a game where you've got them all, but you're saying I'm just not going to give it to you. Part of this is I understand we all love the game. I don't. So, if you've got all the documents, get them out there.

MR. WILES: We will get them on the website as quickly as we can.

THE COURT: Thank you. That would be the way to do it.

MR. WILES: And no later than May 22.

THE COURT: All right. But if you want Mr. Bird to be producing things as quickly as he gets them, whatever you've got, you've got to do it the same way.

MR. WILES: Okay, I understand.

THE COURT: All right. Very good.

MR. WILES: May I have one second to just say we got these responses on April 4. We haven't asked for any continuances.

THE COURT: Yes. I understand, I understand.

MR. WILES: Okay, thank you.

THE COURT: Okay. All right, everyone, take care.

MR. BIRD: Thank you, Your Honor.

MR. WILES: Bye, Your Honor.

(Whereupon, at 3:13 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

CERTIFICATE

DOCKET NO.: 04-1414C

CASE TITLE: DirecTV Group v. United States

HEARING DATE: May 5, 2008

I certify that the foregoing is a true and correct transcript made to the best of our ability from a copy of the official electronic digital recording provided by the United States Court of Federal Claims in the above-entitled matter.

Date: May 5, 2008

Shari Acosta

Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018