# In the United States Court of Federal Claims

### No. 04-1414C
### (Filed: October 14, 2009)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| | * CAS 413 Segment Closing Payment |
| **DIRECTV GROUP, INC.,** | * Obligation; Transfer of Pension Asset |
| | * Surplus; "Cost Reduction"that Meets or |
| **Plaintiff,** | * Exceeds Seller's Segment Closing |
| | * Payment Obligation to the Government; |
| **v.** | * Cost Accounting Standard ("CAS") |
| | * 413.50(c), 48 C.F.R. § 9904.413- |
| **THE UNITED STATES,** | * 50(c)(12)**;** Credits clause, FAR 31.201-5, |
| | * 48 C.F.R. § 31.201-5; Allowable Cost |
| **Defendant.** | * and Payment clause, 48 C.F.R. § 52.216- |
| | * 7; Taxation clause, 48 C.F.R. § 31.205- |
| * * * * * * * * * * * * * * * * * * | * 41(d). |

*Alexander F. Wiles,* Los Angeles, CA, for plaintiff.  Alan C. Brown, McLean, VA, and Alan J. Heinrich, Los Angeles, CA, of counsel

*C. Coleman Bird,* U.S. Department of Justice, Washington, DC, with whom were *Tony West*, Assistant Attorney General, and *Jeanne E. Davidson,* Director, for defendant.

## O P I N I O N

**FIRESTONE**, *Judge*.

Pending before the court is DIRECTV Group, Inc.'s ("DIRECTV's") motion for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  For the reasons that follow, the court **GRANTS** DIRECTV's motion.

# FACTS

## I.    Background Precedent

This case is another in the series of cases involving the implementation of the

original Cost Accounting Standard ("CAS") 413.50(c), 48 C.F.R. § 9904.413-50(c)(12)

(1994) ("CAS 413" or "original CAS 413"),[1] which was promulgated in 1977 and then

substantially revised in 1995.  See 48 C.F.R. § 9904.413-50(c)(12) (2006) ("revised

CAS").  The subject CAS 413 provision deals with the treatment of the pension asset

surplus or deficit that is attributable to the government's pension cost payments under

government cost-reimbursement contracts, after the closing, including the sale, of a

segment.[2]  See generally Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001)

_____

[1]This court has previously explained the requirements of the original CAS 413 as follows:

> The original CAS 413 calls for this accounting whenever there is a "segment closing." "Segment" is defined under CAS 413 to mean "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office." 4 C.F.R. § 413.30(a)(11) (1986). The term "closing" is not defined. In the event a contractor closes a segment, CAS 413.50(c)(12) expressly provides that the contractor must:

> ["]determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment. . . . The calculation . . . shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. . . . The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.["]  Id. at § 413.50(c)(12) (emphasis added).

Teledyne, Inc. v. United States, 50 Fed. Cl. 155, 158 (2001) (quoting original CAS 413, 4 C.F.R. § 413.50 (1986)).

[2]The Senate report on the CAS Board's enabling statute explains cost-reimbursement contracts as follows:

("Teledyne") aff'd sub nom, Allegheny Teledyne Inc. v. United States, 316 F.3d 1366

(Fed. Cir. 2003), cert. denied sub nom., Gen. Motors Corp. v. United States, 540 U.S.

1068 (2003).[3]  It is now established that after the CAS 413 segment closing calculation is

performed, the pension asset surplus attributable to government contributions made in

connection with certain cost-reimbursement contracts is recoverable under the Allowable

Cost and Payment clause, FAR 52.216-7(h), 48 C.F.R. § 52.216-7(h) (2002), and the

Credits clause, FAR 31.201-5, 48 C.F.R. § 31.201-5 (2007).[4]

---

There are two basic types of negotiated procurement contracts.  One is termed a fixed price contract where the final price negotiated remains fixed unless a change is mutually agreed to.  The second type is termed a cost-reimbursement contract wherein the final price depends upon the actual costs incurred during the life of the contract.  In either case, an accurate measurement of cost is required.

S. Rep. No. 91-890 (1970), reprinted in 1970 U.S.C.C.A.N. 3768, 3770.

[3] In the case of cost-reimbursement contracts, the government pays the actual costs incurred, including pension costs, although the true amount of these costs cannot be known until years later when workers retire and their pensions are paid.  Various actuarial assumptions are used to calculate the projected pension costs and these assumptions are used to calculate the government's pension contributions.  These actuarial assumptions may ultimately prove to have been too conservative, whereupon the contractor has accumulated a pension asset surplus in the pension fund.  A portion of that pension asset surplus is attributable to government contributions. CAS 413 segment closings deal with the situation where the segment closes and the government has no means of recouping the pension asset surplus by reducing the amount of future pension contributions to the segment, because the segment no longer has government contracts.  See Teledyne, 50 Fed. Cl. at 164-65.

[4]As the court explained in Teledyne,

[u]nder the Allowable Cost and Payment clause, if the CAS 413 calculation shows a surplus, the contractor will be required "to pay to the Government any refunds, rebates, credits, or other amounts . . . accruing to or received by the Contractor . . . to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government." 48 C.F.R. § 52.216-7(h)(2). The provision is then implemented through the Credits clause, which states that, "The applicable

In <u>General Electric Co. v. United States</u>, 84 Fed. Cl. 129 (2008) ("<u>GE II</u>"), another

CAS 413 case, the court examined in greater detail a segment seller's CAS payment

obligations when the seller, in connection with the sale of the segment, retains a portion of

the pension asset surplus while also transferring to the segment buyer a pension asset

surplus that far exceeds the amount necessary to meet the pension liabilities that were

transferred to the buyer as part of that same transaction.  In such situations, the

government may achieve significant pension cost savings from the seller's transferred

pension asset surplus that exceed the government share of the pension asset surplus

retained by the seller.  More specifically, the transfer of surplus pension assets from

Company A (which has an over-funded pension plan) to Company B (which has an under-

funded pension plan) will result in a cost savings to the government where the transferred

amount reduces the pension costs the government would otherwise have had to pay on its

contracts with Company B.

    After substantial briefing, including briefing from DIRECTV as an amicus curiae,

the court determined in <u>GE II</u> that the government must consider the surplus pension assets

that GE transferred to the buyer when settling up GE's CAS 413 payment obligation to the

---

portion of any income, rebate, allowance, or other credit relating to any allowable
cost and received by or accruing to the contractor shall be credited to the Government
either as a cost reduction or by cash refund." <u>Id.</u> § 31.201-5.  In the case of a pension
deficit identified as a result of the CAS 413 segment closing adjustment, the
contractor will be able to claim the additional pension costs as allowable costs at the
time of final contract close out.  <u>Id.</u> § 52.216-7.

<u>Teledyne</u>, 50 Fed. Cl. at 182.

government.[5]  GE II, 84 Fed. Cl. at 131.  While the court did not resolve the methodology

for determining the precise value to the government of the transferred surplus pension

assets (attributable to the seller's pension contributions), it held that where the government

was aware of the transfer of the pension asset surplus and approved the transaction

through an advance agreement or novation agreement, the seller may count the value of

the surplus pension assets it transferred to the buyer toward meeting its CAS 413 segment

closing payment obligation to the government.  Id. at 150.  The court stated in GE II:

> [I]n appropriate circumstances, such as those before the court, where segment
> sales have been reviewed and approved by the government and the transfer of
> pension assets and liabilities, including a surplus, has been approved by the
> government, satisfaction of the CAS 413 segment closing adjustment obligation
> may be achieved through the cost reductions the government will receive from
> its contracts with the buyer.

Id.

The court held that the Credits clause, FAR 31.201-5, 48 C.F.R. § 31.201-5,[6] which

governs the payment of the CAS 413 segment closing obligation, authorizes the seller to

---

[5]The court also determined that the new CAS 413 provision, which resulted from a 1995
amendment and states that the government will not consider any of the transferred assets in the
segment closing calculation, may not be retroactively applied to the portion of the segment
closing adjustment involving pension costs paid prior to the promulgation of the new CAS 413.
GE II, 84 Fed. Cl. at 143-44.

[6]As noted above, the court held in Teledyne that the government is entitled to payment for
its CAS 413 share under the Credits clause, which provides, in pertinent part, that "[t]he
applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost
and received by or accruing to the contractor shall be credited to the Government either as a cost
reduction or by cash refund."  Teledyne, 50 Fed. Cl. at 182 (quoting FAR 31.201-5, 48 C.F.R. §
31.201-5) (internal brackets removed).

make its CAS 413 payment to the government either in cash or through a cost reduction.

The court held that the Credits clause does not preclude the contractor from fulfilling its

CAS 413 payment obligation by securing a cost reduction for the government from the

successor contractor.  Indeed, the court noted that the Department of Defense and the

Defense Logistics Agency have endorsed this approach in other cases.  See GE II, 84 Fed.

Cl. at 149-50.

The court also reasoned that if the government did not give appropriate credit to the

seller for the cost savings attributable to the transferred surplus pension assets, the

government would receive a windfall in contravention of Congress's intent as set forth in

the CAS authorizing legislation.  The court explained that under this legislation, 41 U.S.C.

§ 422(h) (2006), Congress provided that the government should be protected from paying

"increased costs" to a contractor in the event the contractor fails to comply with the CAS.

GE II, 84 Fed. Cl. at 148.  However, the legislation goes on to state that the government is

not entitled to recover more than the "increased costs" incurred by the government as a

result of the contractor's failure to comply with the CAS.  41 U.S.C. § 422(h).  The clear

implication of this provision, the court reasoned, is that under the CAS, neither contractors

nor the government are entitled to a windfall in connection with the application of the

CAS.  GE II, 84 Fed. Cl. at 148.  Therefore, the government is not entitled to require that

its share of the surplus pension assets following a segment closing be paid by the seller in

cash when the government receives an equal or greater cost reduction from government

contracts with the buyer attributable to the seller's pension contributions to the transferred

segment's pension plan.  In such cases, the benefit the government receives from pension cost reductions attributable to the seller's transferred pension asset contribution makes the government whole.

In this case the court is called upon to apply its GE II holding to DIRECTV's segment closing.

## II.    Stipulated Facts

The following facts are not in dispute and have been agreed to by the parties.  At issue in this case are two segment closings involving DIRECTV as the seller in which there were pension asset surpluses attributable to DIRECTV's various cost-reimbursement contracts with the government.  The first segment closing occurred on December 17, 1997, when DIRECTV (formerly Hughes Electronics Corporation) completed a spin-off of DIRECTV's defense business units ("Defense Segment") and merged those units with Raytheon Company ("Raytheon").  The second segment closing occurred on October 6, 2000, when DIRECTV completed a similar transaction with The Boeing Company ("Boeing").  In the Boeing transaction, DIRECTV transferred its satellite business units ("Satellite Segment") to Boeing.

In connection with the Raytheon transaction, DIRECTV transferred to Raytheon $5,774,655,148 in pension assets and $3,310,028,559 in pension liabilities, resulting in the net transfer of $2,464,626,589 in surplus pension assets for the transferred segment.

In connection with the Boeing transaction, DIRECTV transferred to Boeing $1,843,930,981 in pension assets and $1,037,344,156 in pension liabilities, resulting in a

net transfer of $806,586,825 in surplus pension assets for the transferred segment.

The government's share of the pension surplus for each segment, which includes

both of the pension plans offered by DIRECTV, is as follows:

| Defense Segment (Raytheon) | Nonbargaining Plan | Bargaining Plan |
|---|---|---|
| Assets Allocable to Segment | $ 4,950,355,329 | $ 824,299,819 |
| Liabilities Allocable to Segment | $ 2,874,703,872 | $ 435,324,687 |
| Segment's Surplus | $ 2,075,651,457 | $ 388,975,132 |
| Government's <u>Teledyne</u>[7] Share | 8.625% | 8.005% |
| Amount Owed Government | $ 179,024,938 | $ 31,137,456 |
| Total Owed Government under <u>GE II</u> Decision (Defense) | $ | **210,162,397** |
|  |  |  |
| **Satellite Segment (Boeing)** | **Nonbargaining Plan** | **Bargaining Plan** |
| Assets Allocable to Segment | $ 1,515,790,190 | $ 292,140,791 |
| Liabilities Allocable to Segment | $ 889,683,156 | $ 147,661,000 |
| Segment's Surplus | $ 662,107,034 | $ 144,479,491 |
| Government's <u>Teledyne</u> Share | 7.975% | 7.22% |
| Amount Owed Government | $ 52,803,036 | $ 10,431,440 |
| Total Owed Government under <u>GE II</u> Decision (Satellite) | $ | **63,234,476** |
| **Total (Both Segments)** | $ | **273,396,873** |

Based on these undisputed facts, the government's <u>Teledyne</u> share for both

---

[7]As stated above, the <u>Teledyne</u> share is share of surplus pension assets that the seller of a segment owes to the government at the time of a segment closing. This share is based upon the difference between the actuarial liability of the segment and the market value of the assets at time of the segment closing.

segments is just over $273 million, $210 million of which is attributable to the Defense Segment and $63 million of which is attributable to the Satellite Segment. Thus, DIRECTV transferred to Raytheon more than eleven times the amount needed to meet DIRECTV's segment closing obligation of $210 million to the government and transferred to Boeing more than twelve times the amount needed to meet DIRECTV's segment closing obligation of $63 million to the government.

The government and DIRECTV do not agree on how to calculate the benefit the government has received by virtue of DIRECTV's transfer of such large pension asset surpluses to Raytheon and Boeing. However, the government concedes that if the GE II decision is binding, the benefit the government has received in pension cost reductions from the billions in excess pension assets transferred to Raytheon and Boeing by DIRECTV is greater than the $273 million DIRECTV owes the government following the segment closings. Under this court's holding in GE II, if the government obtains cost reductions from Raytheon and Boeing due to the transferred pension surplus in an amount that is greater than the amount DIRECTV owed to the government, DIRECTV does not owe the government any direct payment. GE II, 84 Fed. Cl. at 148. As the government recognizes:

> If the GE[ II] case is the law of this case, then we do not dispute that the cost reduction to the Government was [more] than DIRECTV's CAS 413 segment closing obligation to the Government under the GE[ II] decision, and the Court need not spend its time resolving the extent, if any, by which DIRECTV's calculation overstates the cost reduction to the Government resulting from the transferred surplus."

Def.'s Opp'n to Ptf.'s Mot. [Partial] Summ. J. ("Def.'s Opp'n") 6.[8]

Finally, it is not disputed that DIRECTV did not present any evidence regarding the role the government played in either reviewing or approving the subject sales from DIRECTV to Raytheon or Boeing.

## DISCUSSION

## I.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted).  In considering a motion for summary judgment, the court's role is not to "weigh

---

[8] The government goes on to state:

> If the GE[ II] case is not the law, however, then the amount of cost reduction from the transferred surplus in the hands of the buyers is simply irrelevant to the resolution of this case.  Thus, the Court need not resolve the differences between the parties regarding the exact amount of the present value of the cost reduction that the Government received.

Def.'s Opp'n 6.  In other words, what the court is asked to resolve at this stage is not the amount owed, if any, or even the method to be used to calculate it.  Rather, the court's sole task is to determine whether the facts of this case compel the court to revisit its holding in GE II.

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990); Casitas Mun. Water Dist., 543 F.3d at 1283. Also, where the movant bears the burden of proof, as is the case here, "summary judgment cannot be granted unless the movant makes a showing on each required element" of its case. Lencco Racing Co. v. Jollife, 215 F.3d 1341 (Fed. Cir. 1999) (citing Nat'l State Bank v. Fed. Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992)).

## II.     The Government Has Not Provided a Basis for Reconsidering the Holding in GE II.

It is clear from the parties' arguments that there are no disputed issues of material fact regarding the value of the benefit the government has received from DIRECTV's transfer of a significant pension asset surplus to Raytheon and Boeing. To the extent the parties disagree as to the method of valuation, the government concedes that the court need not resolve any dispute between DIRECTV and the government regarding DIRECTV's method of calculating the reduction in pension costs charged to the government resulting from DIRECTV's surplus transfers. Def.'s Opp'n 6. The government acknowledges that DIRECTV's transfers resulted in a benefit to the government that is worth more than what DIRECTV would owe if it made a direct payment to the government to satisfy its payment obligation following the segment closing

under CAS 413.[9]  Id. at 5.

The government, however, argues that summary judgment for DIRECTV is not appropriate because the government disagrees with the court's holding in GE II.  For the reasons that follow, the court finds that the government's arguments in this case do not provide a basis for revisiting its holding in GE II.

The government argues that absent an express agreement from the government, the segment seller cannot satisfy its CAS 413 payment obligation to the government through a pension cost reduction to the government from the segment buyer.  The government argues that the court's holding in GE II is wrong and that the Credits clause does not allow a contractor to meet its CAS 413 payment obligations to the government through cost reductions obtained from the successor contractor without the government's "express agreement."  Because DIRECTV has provided no evidence that the government agreed to accept a cost reduction from Raytheon or Boeing in lieu of a cash payment from DIRECTV, the government argues that DIRECTV must pay cash to the government to fulfill its CAS 413 payment obligation.  According to the government, if the government does not expressly agree to accept a cost reduction from the buyer in satisfaction of the seller's CAS 413 payment obligation, then it is entitled to receive both (1) cash from the seller and (2) a cost reduction from the buyer that equals or exceeds that same amount.

_____

[9]The Federal Circuit recently stated in another CAS 413 case that there is "no economic difference" to the government between a cost savings or a direct cash payment made in the same period.  Gates v. Raytheon Co., --- F.3d ----, 2009 WL 2914340, at *8 n.8 (Fed. Cir. 2009).

The choice, the government contends, belongs to the government.  In support of this

contention, the government relies on the language of the Credits clause and other FAR

provisions, including the Allowable Cost and Payment clause, 48 C.F.R. § 52.216-7

(1998), and the Taxation clause, 48 C.F.R. § 31.205-41(d) (1996).

      DIRECTV argues in response that the government's reading of the Credits clause is

not correct.  According to DIRECTV, the Credits clause allows the selling contractor to

satisfy its CAS 413 payment obligation to the government "'either [through]. . . a cost

reduction or by a cash refund.'"  Ptf.'s Reply 5 (quoting FAR 31.201-5, 48 C.F.R. §

31.201-5) (emphasis added).  DIRECTV argues that the government is not entitled to a

double payment.  In support of this contention, DIRECTV notes that in deposition

testimony considered by the Court in GE II, the government's own expert conceded that

when a pension surplus is transferred, there is "a cost reduction, which would be

equivalent to a credit or a direct cash payment."  See Reichel Dep. 48:5-6, GE II, 84 Fed.

Cl. 129 (No. 99-172) (Feb. 20, 2008).  In addition, DIRECTV notes, as the court discussed

in the GE II decision, that both the Department of Defense ("DOD") and the Defense

Logistics Agency ("DLA") have allowed contractors to meet their CAS 413 payment

obligation following the sale of a segment by transferring excess pension assets to the

segment buyer.  GE II, 84 Fed. Cl. at 149-50.  With regard to the government's reliance on

other FAR provisions, DIRECTV contends that none of the FAR provisions identified by

the government warrant reconsideration of the court's GE II holding.

The court agrees with DIRECTV that the government's reading of the Credits clause is too narrow and that the Credits clause does not require double payment where the evidence establishes that the seller's segment closing payment obligation was satisfied by the cost reduction the government received under its contracts with the buyer due to the pension asset surplus transferred by the segment seller.  The court also finds that none of the other FAR provisions cited by the government require the court to reconsider the GE II decision.

First, the government's contention that the Credits clause does not allow for cost reductions by third parties based on the reference to FAR 31.205-6(j)(4), 48 C.F.R. § 31.205-6(j)(4) (1998),[10] in the Credits clause is not supported.  Def.'s Opp'n 8.  A careful reading of FAR 31.205-6(j)(4), demonstrates that it governs the termination of pension plans.  When pension plans are terminated, payments are made to the beneficiaries and any surplus is retained by the contractor.  In such cases, the FAR properly provides that the "contractor shall make a refund or give a credit to the Government."  Id. (quoting FAR 31.205-6(j)(4), 48 C.F.R. § 31.205-6(j)(4).  This case, however, involves the continuation

---

[10]Prior to a subsequent amendment, FAR 31.205-6(j)(4) provided:

(4) Termination of defined benefit pension plans. When excess or surplus assets revert to the contractor as the result of termination of a defined benefit pension plan, or such assets are constructively received by it for any reason, the contractor shall make a refund or give a credit to the Government for its equitable share of the gross amount withdrawn.

FAR 31.205-6(j)(4), 48 C.F.R. § 31.205-6(j)(4).

of a pension plan, not the termination of a pension plan.  Accordingly, the subject FAR

provision is irrelevant.

Second, the government's reliance on the Allowable Cost and Payment clause is

misplaced.  The government argues that under this FAR provision, 52.216-7(h)(2), 48

C.F.R. § 52.216-7(h)(2) (1998), "'[t]he Contractor shall pay to the Government any

refunds[ or] rebates, . . . for which the Contractor has been reimbursed by the

Government,'" Def.'s Opp'n 9 (quoting FAR 52.216-7(h)(2), 48 C.F.R. § 52.216-7(h)(2)

(1998)).  The government contends that this language confirms that the selling contractor,

as the party that had been reimbursed pension costs by the government, must itself repay

the government.  The government states that the contractor cannot "make arrangements

without the Government's approval[ ] to have the contractor's obligation satisfied by

benefits allegedly to be received from a third party."  Def.'s Opp'n 9.  Again, the

government ignores the fact that in GE II, the court recognized the role of the government

in approving the subject transactions through advance agreements and novation

agreements.  Certainly, where the government understands that the transferred pension

asset surplus attributable to the selling segment contractor's pension contributions will be

more than adequate to secure cost reductions for the government that equal or exceed the

selling contractor's CAS 413 payment obligation, the Allowable Cost and Payment clause

does not mandate that the government receive a cash payment from the seller plus a

pension cost reduction from the buyer in an equal amount.  Because the Allowable Cost

and Payment clause is implemented through the Credits clause,[11] the segment seller can

meet its payment obligation either through a cash payment or a cost reduction.

Next, the government's reliance on the Taxes provision, FAR 31.205-41(d), 48

C.F.R. § 31.205-41(d) (1996), is mistaken.  See Def.'s Opp'n 10.  This provision states

that "[a]ny taxes, interest or penalties that were allowed as contract costs and are refunded

to the contractor shall be credited or paid to the Government in the manner it directs."

FAR 31.205-41(d), 48 C.F.R. § 31.205-41(d).  Although the government contends

otherwise, this provision supports the court's conclusion regarding the selling segment's

CAS 413 payment obligation, because in contrast to the Taxes provision, which allows the

government to "direct" or dictate how payment is to be made, the Credits clause does not

contain "directing" language.  It is well-settled that when regulations use different words,

they have different meanings.  See Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004)

_____

[11]In its holding in Teledyne, the court noted the following:

> Under the Allowable Cost and Payment clause, if the CAS 413 calculation shows a
> surplus, the contractor will be required "to pay to the Government any refunds,
> rebates, credits, or other amounts . . . accruing to or received by the Contractor . . .
> to the extent that they are properly allocable to costs for which the Contractor has
> been reimbursed by the Government."  48 C.F.R. § 52.216-7(h)(2).  The provision
> is then implemented through the Credits clause, which states that, "The applicable
> portion of any income, rebate, allowance, or other credit relating to any allowable
> cost and received by or accruing to the contractor shall be credited to the Government
> either as a cost reduction or by cash refund."  Id. § 31.201-5.  In the case of a pension
> deficit identified as a result of the CAS 413 segment closing adjustment, the
> contractor will be able to claim the additional pension costs as allowable costs at the
> time of final contract close out.  Id. § 52.216-7.

Teledyne, 50 Fed. Cl. at 182.

(quoting 2A Norman J. Singer, Statutes and Statutory Construction § 46:06 (6th ed. 2000)).  Thus, there is no basis for the government's claim that the government has the same authority under the Credits clause as it has under the Taxes clause to direct the method of payment.

Finally, the court notes that the government has not provided it with any basis for questioning its conclusion that under the CAS authorizing legislation, 41 U.S.C. § 422(h)(3), the government may not recover a windfall in connection with collecting its CAS 413 share.  GE II, 84 Fed. Cl. at 147-48.  As the court explained in GE II, "the language of the CAS authorizing legislation makes clear that the CAS protect the government from paying increased costs as a result of [a] segment closing adjustment but prohibit the government from receiving a windfall."  Id. at 148.  The government has conceded in this case that it has received more in pension cost savings from Raytheon and Boeing because of the transfer of a pension asset surplus from DIRECTV than  DIRECTV would owe the government under any proper CAS 413 calculation.  Def.'s Opp'n 6.  As such, the government has acknowledged that it would receive a windfall if it were to collect cash from DIRECTV after it has received cost reductions from Boeing and Raytheon.  The CAS authorizing legislation does not allow this result.

In light of the foregoing discussion, the court concludes that the government has not provided the court with any reason to reconsider its holding in GE II.

III.   **DIRECTV's Failure to Provide the Court with Evidence to Show that the Government Was Able to Protect Its Interests Through an Advance Agreement or Novation Agreement Before DIRECTV Transferred Surplus Pension Assets to Raytheon and Boeing Is Not Material to the Outcome of this Case.**

The sole issue remaining is whether DIRECTV's failure to present any evidence to show that the government recognized through an advance agreement or novation agreement that DIRECTV's CAS 413 payment obligation could be satisfied by reduced pension cost payments to Raytheon and Boeing is material to awarding summary judgment in this case.

In the context of the GE II decision, the court determined that through advance agreements and novation agreements the government had approved the segment sales and had been given an opportunity to protects its interests with regard to the pension asset surplus.  GE II, 84 Fed. Cl. at 146 n.26.  Although the issue was not discussed at length, the court reasoned that the government would not have agreed to allow the buyer to take over the seller's contracts if the government's interest in the surplus pension assets were not protected.  Id.  The evidence in the GE case made it plain that the government carefully evaluated the pension cost question before authorizing the transfer of government contracts.  Id. at 134-35.

Here, DIRECTV has not provided any evidence of any agreement between the government and DIRECTV to show that the government had the opportunity to protect its interests before DIRECTV sold its segments to Raytheon or Boeing.  Nonetheless, in

contrast to the facts in <u>GE II</u>, the government concedes in this case that it has received a benefit from the surplus pension assets transferred by DIRECTV to Raytheon and Boeing in the form of reduced pension costs exceeding the value of DIRECTV's CAS 413 payment obligation.  In such circumstances, DIRECTV argues, evidence of steps taken by the government to protect its interests through a novation agreement or other action prior to DIRECTV's transfer of its pension asset surplus to Raytheon and Boeing is immaterial. DIRECTV argues that where the government has, in fact, received cost reductions from Raytheon and Boeing that exceed DIRECTV's CAS 413 payment obligation to the government, the government's interests have been protected.  Although the government disagrees with this assertion, it has not presented any basis for challenging DIRECTV's contention.

The court agrees with DIRECTV that in this case, where the undisputed evidence demonstrates that the government received the value of DIRECTV's CAS 413 segment closing obligation through a cost reduction from the successor contractors, the existence of a government agreement in which the government protected its interest in the pension asset surplus through a novation agreement or other means is not material.  The government concedes that under any CAS 413 calculation, it has received cost reductions that exceed DIRECTV's CAS 413 payment obligation to the government.  The government is not entitled to an additional "cash" payment of an equal amount. DIRECTV has satisfied its CAS 413 payment obligation to the government and is entitled to summary judgment.

**CONCLUSION**

For the foregoing reasons, DIRECTV has no remaining liability to the government stemming from the segment closings.  Accordingly, DIRECTV's motion for summary judgment is **GRANTED**.  Each party to bear its own costs.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge